MICHAEL GALE, Plaintiff-Appellant, *v.* LINDA HOEKSTRA, Defendant-Appellee.

First District (4th Division)  No. 62360

Opinion filed April 13, 1978.

Karlin & Fleisher, of Chicago (Theodore A. Gilbert and Peter D. Corti, of counsel), for appellant.

Beverly, Pause, Duffy & O'Malley, of Chicago (Frank J. Pause, James R. Patterson, Dom J. Rizzi, and Michael W. Rathsack, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff, having been struck by the defendant's car while he was walking along the wrong side of the road,[1] appeals from a jury verdict for the defendant claiming error in that:

(1) the trial judge, after the jury had retired, in response to a question from the jury, and in the absence of counsel who had elected not to be present, suggested there were two construction sites along the side of the road;

(2) the trial judge, after the jury had returned a general verdict finding the defendant not liable and a special verdict finding the plaintiff not guilty of contributory negligence, suggested that the two verdicts should be consistent, whereupon the jury changed the finding in the special verdict;

(3) the trial court permitted a part-time policeman who had investigated between 100 and 200 accidents prior to the time of this accident to testify as a reconstruction witness, in that he was permitted to testify that he found no tire marks on the shoulder of the road and that he would have expected to find some if the defendant had driven onto the shoulder.

No other errors were alleged in the plaintiff's principal brief.

Under the facts of the case we find no prejudicial error and affirm.

The plaintiff, Michael Gale, was struck by the defendant's car on November 3, 1972 at about 7:30 p.m., while he was walking north along the east side of Central Avenue, an unlighted street in the City of Oak Forest. He and a friend of his, Brian Schacht, were walking north along Central because Michael's automobile had broken down at 163rd and Central. The accident occurred at about 157th and Central. Michael testified that it was not raining at the time of the accident although it had been drizzling earlier. Later he admitted that in an earlier statement he had said it was kind of misty. He was wearing a blue fluorescent shirt with a pair of dark blue dress slacks. He did not indicate whether he was wearing a jacket. There was construction on the west side of Central at 159th Street extending about 1½ or 2 blocks. The ground was all dug up and there were wooden horses with blinking lights. There was absolutely no construction on the east side. At 159th, Central Avenue is a four-lane street but it narrows to two lanes before 157th. It also runs uphill. Michael

---

[1] Ill. Rev. Stat. 1971, ch. 95½, par. 11—1007(a).

testified that he walked along the apron on the east side of the road until the road narrowed, then stepped off onto the shoulder. The shoulder of Central at 157th was about 6½ or 7 feet wide and was made up of crushed rock and dirt. Michael stated he never walked on the paved section after it became two lanes. He was about five or six feet north of the point where the apron disappeared when he was struck. This was about 10 to 20 feet south of the top of the hill. He had stopped because he had stepped in some mud and was trying to shake it off his shoe; he was on the shoulder about two feet from the side of the road. Brian was walking about six feet ahead of him and a little to the right. Michael never saw the plaintiff's car before he was hit; he heard no horn nor screeching of brakes. He was thrown about 50 feet or more. On cross-examination he agreed that the east shoulder was muddy. He needed glasses to see distances but was not wearing them at the time; they were in his pocket.

Brian Schacht corroborated Michael's testimony that they had walked along Central after Michael's car broke down; they had walked on the east side along the apron and then on the shoulder; it was not raining at the time although it had rained earlier; the impact occurred before the crest of the hill and Michael was wearing a light blue shirt and black or blue pants. Brian testified he had been walking in front of Michael but turned when he was struck by something which turned out to be dirt Michael was kicking. At that moment Michael was hit. Michael was on the dirt portion of the road when he was struck. When the automobile struck Michael it was two or three feet off the road. Brian heard no horn nor screeching of brakes. There was no southbound traffic in the area at the time of the impact. Brian also testified that when the police arrived later one parked in front of Michael and one parked in back, on the shoulder of the road.

On cross-examination Brian testified that there was no artificial lighting in the area; the houses were set away from the area; and on the east side, there were trees about ten or fifteen feet east of the road and then a field, nothing else. Before he turned around to look at Michael, Brian was two or three feet east of the edge of the roadway. Michael was maybe two feet west of him, possibly more.

Michael's mother testified that Michael had been wearing a light blue shirt and a dark blue pair of pants before he left home the evening of the accident. His boots after the accident were covered with mud. Michael did own a pair of blue jeans and a blue denim jacket.

The hospital records indicate Michael stated to the doctor that he was hit while walking in the street.

Linda Hoekstra, the defendant, testified that before the accident she had been shopping at the Jewel, which is at Central and 159th. When she drove out of the parking lot, she turned left and proceeded up Central.

Since she had been to the Jewel before, she was relatively familiar with the area. It was raining and she had her windshield wipers on. The car headlights were on dim. The car radio was on. The pavement was wet. Her fastest speed before the accident was 35 m.p.h., which was below the posted speed limit. There was no lighting in the area either from artificial light or from houses. She could not see the two pedestrians until the car reached the crest of the hill where the road begins to level off. At that time her car was on the right-hand side of the northbound lane. (Central was already reduced from four to two lanes.) When she first saw Michael he was standing or walking in the roadway about 15 feet from the point where the road leveled off. His companion was on the shoulder some distance north. She applied her brakes slowly and steadily—she did not jam her brakes because then the car would have skidded—and she moved the car as far left as she could. She could not move it beyond the center line because there were several cars in the southbound lane. She did not sound her horn. There was no time to use the headlight blinkers. The car had slowed to about 20 m.p.h. by the time it struck Michael about three to five seconds after she first saw him. He was still on the roadway, about two feet from the east side of the pavement. At no time between the time she first saw Michael and the time of the impact did the lights show a reflection of anyone's face. Michael was wearing a navy denim jacket with long sleeves and dark pants. She did not notice what he had on underneath the jacket, nor did she remember what his companion was wearing. After her car struck Michael, Linda stopped it some distance ahead. Once stopped she pulled off onto the shoulder and turned the ignition off. When she pulled off onto the shoulder she felt a slight bump. She did not feel such a bump before the impact. At no time before the impact was she off the roadway.

After she turned the ignition off, Linda got out and started walking towards the boys. Michael's companion said she should call the police and an ambulance. A man at the second house at which she stopped first called both police and an ambulance and then drove his car across the highway and parked it, with flashers on, just south of Michael who was sitting on the shoulder. She once stated the gentleman parked on the shoulder, but later said she did not remember if he parked on the shoulder or not. Two police vehicles came; one parked behind her car and one parked on the road. The police officers investigated for skid marks using flashlights.

Officer William Nowicki also testified for the defendant. He and some other officers arrived at the accident scene in two squad cars in response to the call. Officer Nowicki had worked approximately 20 hours per week as a police officer for 5½ years. He performed routine patrol work and had received special training in schools run by the F.B.I., the city of Oak

Forest and the State's Attorney of Cook County. He had investigated between 100 and 200 accidents at the time this accident occurred.

At the accident scene he found the plaintiff lying just beyond the crest of the hill on the shoulder, approximately 100 feet north of the point where the rising slope of the roadway leveled off. The defendant was parked 120 to 200 feet beyond him. Nowicki believed Michael was wearing a black jacket; he was not sure of the color of his pants.

It was dark in the area and it was raining. The shoulder was of soft gravel. There may have been some mud mixed in because there was construction a little further south of the area. They were widening Central Avenue about 200 feet south of 157th Street from two lanes to four lanes and there were construction barricades and mud on the shoulders in that location.

After seeing to Michael and talking with the parties involved, he checked the roadway for any skid marks that might have been there and the soft shoulder for any skid marks that might have been on it. By skid marks he meant any tire marks which indicated a vehicle had gone off the roadway and driven back on the roadway from the shoulder. He searched the area for two to three hundred feet south of where Michael was found and found no marks on either the roadway or the shoulder. Over an objection to stating what might have been, he stated that he considered his failure to find any marks important. Over a general objection he explained that he found it important because the pedestrian had stated that the driver had driven off the roadway onto the shoulder and struck him, and he (the officer) could not find any marks on the shoulder. The driver stated she had been on the roadway. There were no marks on the roadway with the street being wet. Nowicki wouldn't actually expect to find any on the roadway. Over objection that Nowicki was not an expert, would need to know the weight of the vehicle and the consistency of the shoulder, and that he was being asked to testify to an ultimate issue, Nowicki testified that he would have expected to find marks if the vehicle went off the road. The court, in overruling the objection, pointed out that the photograph definitely showed mud at that location. Nowicki further testified that it was not possible that there were tire marks there he did not see. When he arrived at the scene he parked on the roadway near Michael. The ambulance subsequently parked in front of the police car. He did not remember that any car parked south of Michael on the shoulder.

Officer Nowicki also testified that Linda told him that she did not see Michael before the impact.

## I.

Beside the allegation of error in allowing Officer Nowicki to testify to

what he would expect to find, appellant objects to two instances of alleged misconduct of the trial judge. The first is his complaint that the trial court, outside the presence of counsel, improperly informed the jury there may have been two construction sites. The facts are as follows: After the jury had deliberated for several hours, the deputy sheriff advised the judge that the jury had a question to ask. The court instructed him to bring the jurors to the courtroom in the presence of the court reporter and the judge. Both counsel were contacted by telephone and both waived their appearance. The following colloquy ensued:

"The Court: What is your question?

Mr. Dietz: Our question is whether there was—there seems to be a point on contention whether there was evidence presented as to the distance of the construction site in relation to the impact point. One side said there was such evidence presented and—

The Court: Excuse me. Whether there was evidence presented by the policeman as to the distance between the construction site and the impact site? I don't know what construction site they are talking about.

It appears there might have been two construction sites. There was construction going on on the west side of the road.

The Foreman: According to our interpretation the way the question was raised, some jurors feel that there was evidence presented that there was a construction site some distance south of impact, and the question is what that distance was.

The Court: You have the Exhibits before you that show the pictures of the scene at the time, and I can't give you my version of the evidence. That is the function of the jurors, to decide what they heard.

It was your function to sit there and listen to the testimony and evaluate the people and judge their credibility.

It would be improper for me to tell you what I remember, if there was any testimony affixing the construction site south of the point of the accident or impact, or whether and if so, what the distance was, because I could be in error.

It would likewise be improper for me to have read back to you that part of the testimony, if any, there was affixing that.

It would be practically impossible today to do that, because the court reporter we have today was not here prior to this morning.

It would be impossible for us to get the court reporter to read back.

Even assuming that we had the testimony here in court, it would not be prudent for me to read back only part of the testimony,

because it might place undue emphasis on one part of the testimony without regard to all of the testimony.

You have had the advantage of having sat here throughout the entire presentation, and you can judge for yourselves, and it would seem to me that what you told me; that some believe there was testimony about the distance and some may say that there was not testimony; I have an opinion myself, because I listened to the testimony, but it would be improper for me to tell you what I heard.

Because, you see, I would be usurping your function. I sit here not as a tryer [*sic*] of facts; in this case you are the tryer [*sic*] of the facts."

■■ ■ Counsel for the defendant complains of the judge's communicating with the jury "in secret" and argues that while he may have consented to the trial judge's ascertaining the jury's problem in his absence, he did not agree that the court should further advise or instruct the jury in his absence. We cannot accept this argument for to allow counsel to object to the trial court's action after he had consentingly and deliberately absented himself would be to impede the judicial process. It is the duty of a judge when a jury raises an explicit question on a point of law arising from the facts over which there is doubt or confusion, to attempt to clarify the question in the minds of the jury members. (*People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622.) Likewise, when a jury wishes to rehear or review certain testimony, it is error for a judge to fail to make a preliminary determination as to what testimony the jury desires to have and to fail to exercise his discretion in responding to the jury's request. (*People v. Jackson* (1975), 26 Ill. App. 3d 618, 325 N.E.2d 450, and see *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166.) Counsel knew or should have known this. If, therefore, he was concerned about what the judge, in the performance of his judicial duties, might say in open court before the court reporter, he should have been present. He had notice. Having chosen to ignore the proceedings at a time when a properly phrased objection could have led to a correction of any error in a statement by the court, he should not now be allowed to complain. *Mathes v. Basso* (1968), 104 Ill. App. 2d 237, 244 N.E.2d 362, upon which counsel relies, is not in point. There the judge, with the consent of counsel, entered the *jury room* to determine what the jury's problem was. The appellate court ruled that while counsel agreed that the judge could enter the jury room to ascertain the problem, they had not agreed he could advise the jury. The well settled rule is that no communication should take place between the judge and the jury after the case has been committed to them unless in open court and in the presence of counsel. (35 Ill. L. & Prac. *Trial* § 287 (1958).) In *Mathes*, the judge chose to deviate from this

practice and received counsel's consent—the appellate court simply refused to extend that consent beyond its express terms. Moreover there was no way counsel in *Mathes* could have accompanied the judge to protect his client's interests. Here the trial judge precisely conformed to accepted practice: the communication was in open court and would have been in the presence of counsel except that counsel chose not to attend. Having failed to object to the statement when made, since he was not there, counsel's later objection is untimely.

■■ Even if we were to review this contention on the merits, we would reject the appellant's contention since any error was not prejudicial. It is true that formerly any communication by the judge to the jury in secret was held to be reversible error whether or not the appellant was prejudiced. (*City of Mound City v. Mason* (1914), 262 Ill. 392, 104 N.E. 685.) Here, however, as we have already pointed out, the communication was not in secret. Moreover, even where the communications are not in open court, the modern rule is that, as in any other instance where an appellant seeks a reversal (3 Ill. L. & Prac. *Appeal & Error* §801 (1953)), prejudicial error must be shown. (*People v. Tilley* (1952), 411 Ill. 473, 104 N.E.2d 499, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 641, 73 S. Ct. 23; *Trim v. Chicago & Eastern R.R. Co.* (1972), 5 Ill. App. 3d 939, 284 N.E.2d 499; *Emme v. Pennsylvania R.R. Co.* (1961), 29 Ill. App. 2d 97, 172 N.E.2d 507.) As the latter case said at 29 Ill. App. 2d 97, 102, 172 N.E.2d 507, 509:

> "Juries are the final agency for solution of many thousands of factual disputes which beset the courts. Such an agency must have stamina enough to withstand a diversion as slight as the one in question. In an earlier time, when such disputes had not overwhelmed the courts and a jury case presented an entertaining drama for a good portion of the community, a strict observance of the rules could be imposed. Undoubtedly, the early cases in this state prohibited any communication whatever between judge and jury after the jury had retired. Necessity and common sense have brought about a relaxation of that severe discipline. It is now the rule both in civil and criminal cases that a verdict will not be set aside when it is apparent no injury resulted from a communication to the jury either by the court or by third persons."

■■ Looking at the judge's statements as a whole, it is clear that the jury could only have concluded that he was not telling them what the evidence was, that they were the sole judges of fact and that they were not to rely on any recollection of his as to what the facts were. Even if we merely look at the portion of the statement complained of, we see no prejudice. Counsel argues that the jury would conclude from this there was construction on both sides of the road and that, therefore, plaintiff had no excuse to walk on the east side. Ignoring the fact that the police officer

testified there was construction and mud on the shoulders (not shoulder) and that plaintiff never claimed he was walking on the east side because there was construction on the west side (only his friend did that), the judge only said there might have been two construction sites. He did not say there were; he did not say that if there were, one was on the east and one was on the west. The only definite statement he made was that there was construction on the west side of the road. This statement could have been injurious to the defendant's case but the defendant, needless to say, is not complaining.

In short, the plaintiff through his counsel having voluntarily chosen to absent himself from a portion of the proceedings cannot belatedly enter an objection to a statement made during those proceedings. But even if he could, no prejudice resulted since the jury could not have construed the remarks of the judge as a determination of the facts.

## II.

■■ The plaintiff next contends that the trial court informed the jury that the special verdict should be consistent with the general verdict. First, it does not appear that the court made any such statement. What did happen is that after the jury returned the two verdicts and the trial court discharged those jurors who had finished their jury duty, the court indicated some concern over whether the jury felt there was an inconsistency between the verdicts. The jury repeatedly stated that the general verdict was theirs, they agreed with it and indeed had signed it before they signed the special verdict. However, they did indicate some concern over the special verdict and apparently concluded they had been confused as to the meaning of the term "proximate cause" in the special interrogatory. The jury thereupon changed their answer to the special interrogatory although the court previously had informed them that no change was necessary and that the two verdicts could stand.

It is clear from the record that the jury intended to and did return a general verdict for the defendant. This verdict was returned before the conversation between the judge and jury took place. At no time did the jury display any concern or confusion over the general verdict or indicate that that verdict did not represent their decision. Accordingly, it is not necessary for us to determine whether, in fact, the answer to the special interrogatory was effectively changed from "no" to "yes" or whether the prior discharge of some of the jurors rendered all subsequent proceedings moot. Nor is it necessary for us to determine whether the "yes" answer could stand since the change was initiated by the trial court's conversation with the jurors. (See *Mathes v. Basso* (1968), 104 Ill. App. 2d 237, 244 N.E.2d 362, *appeal denied* (1969), 40 Ill. 2d 580.) Since there was no inconsistency between the initial jury finding that the plaintiff was not

guilty of contributory negligence and the general verdict that the plaintiff had not proved his case (*Legerski v. Nolan* (1971), 132 Ill. App. 2d 51, 265 N.E.2d 696), the general verdict which had been returned before the conversation occurred controls. And since the general verdict would have been controlling even if the conversation between the trial court and the jury had never occurred and the answer to the special interrogatory had never been changed, the plaintiff was in no way prejudiced by the conversation and change. Had the answer remained negative or had the conversation never occurred, the final result would still be the same.

The plaintiff's reliance on *Mathes v. Basso* (1968), 104 Ill. App. 2d 237, 244 N.E.2d 362, *appeal denied* (1969), 40 Ill. 2d 580, is misplaced. In that case the trial judge entered the jury room while the jury was deliberating and informed them that the answers to the special interrogatory and the general verdict should be consistent. Obviously since no decision had been made by the jury, the reviewing court had to assume that the judge's statement affected the jury's final verdict. To the contrary in the instant case, the jury had already returned the general verdict at the time the conversation took place and there was no way the ensuing discussion could retroactively have affected the jury's deliberation and final determination that the defendant was not liable.

### III.

■■ In the petition for a new trial and the notice of appeal the plaintiff contended that the general verdict was against the manifest weight of the evidence. However since the plaintiff failed to raise this issue in his original brief on appeal, it was waived and is not before this court for review (Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1975, ch. 110A, par. 341(3)(7)); *Shoemaker v. Walter* (1974), 22 Ill. App. 3d 532, 318 N.E.2d 33 (abstract); *Garb v. Harris* (1967), 87 Ill. App. 2d 437, 232 N.E.2d 83), even though the point was alluded to, but not argued, in the reply brief. *Molnar v. City of Aurora* (1976), 38 Ill. App. 3d 580, 348 N.E.2d 262; *Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051, 339 N.E.2d 434.

### IV.

■■ The plaintiff's final contention is that the trial judge allowed one not qualified as an expert to give his opinion as a reconstruction expert as to the point of impact when there were eyewitnesses to the accident. The simple answer is Officer Nowicki did not testify as a reconstruction expert to the point of impact. All he did was testify that there were no tire marks on the shoulder (and testimony of the absence of tire marks is admissible under Illinois law (*Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720)), and state that he would have expected to find skid marks if a car had gone onto the shoulder—in other words, that the nature

of the soil was such that tire marks would be left. A reconstruction expert is one who recreates the events of an accident from given information. (*Finfrock v. Eaton Asphalt Co.* (1976), 41 Ill. App. 3d 1020, 355 N.E.2d 214.) This witness was no more to be considered a reconstruction expert than an eyewitness who gives his opinion of the speed of a vehicle.

■■ Furthermore, we believe that the policeman's testimony was proper in this case. It is well recognized that even an ordinary witness may give an opinion on such matters as physical and natural facts which are ascertainable by observations. (Gard, Illinois Evidence Manual, R. 213 (1963).) Whether soil is so muddy that it is likely to show tire marks is certainly a matter capable of observation. It is also a matter which can rarely be precisely described, except by an expert, and where the facts are best and most easily conveyed to the jury by the use of an opinion. Officer Nowicki was testifying as to the nature of a shoulder of a road which he had observed; he could see, as the judge pointed out, that it was muddy, and he had had sufficient experience in investigating accidents from which he could draw a conclusion as to the possibility of tire marks. We agree with the trial court that one does not need to be an expert in physics and know the weight and speed of the vehicle, the weight distribution on the various wheels and the condition of the cars before one can determine whether a shoulder, being soft and muddy, would show tire marks.

■■ Even if the statement that Officer Nowicki would have expected to find tire marks on the shoulder were inadmissible as invading the province of the jury, its admission would not be prejudicial under the facts of the case. Both the plaintiff and his friend testified there was mud on the shoulder. The photographs showed mud on the shoulder. Officer Nowicki testified, without objection, that there was mud on the shoulders because of construction, that it was raining, that the shoulder was soft, that he looked for tire marks and found none. He then testified that he considered it important that he did not find tire marks because the pedestrian had stated the driver had driven off the roadway onto the shoulder and struck him; that the driver had said she stayed on the roadway and that he, Officer Nowicki, would not expect to find any tire marks on the roadway. The plaintiff's only objection to this statement was a general one, which constitutes only an objection to the relevancy of the statement. (Cleary, Handbook of Illinois Evidence §7.2 (1963); 2 Ill. L. & Prac. *Appeal & Error* §258 (1953).) No complaint was made at the time that the testimony was opinion testimony or that it invaded the province of the jury. Yet Officer Nowicki's statement that the absence of tire marks on the shoulder was important because the pedestrian stated the car had been driven onto the shoulder and that he would not expect to find tire marks on the roadway implied that he would expect to find tire marks on

the shoulder if she had driven on the shoulder. His later statement, the only one which was objected to on the ground that it invaded the province of the jury, merely made explicit what had been implied before and told the jury nothing new.

Furthermore, even ignoring Officer Nowicki's statement that the absence of tire marks was important because the pedestrian claimed the automobile was driven onto the shoulder, or considering the objection sufficient to extend to both remarks, which it obviously was not, there still was no prejudicial error, since the matter embraced in Officer Nowicki's opinion was covered by proper evidence sufficient to determine the issue and was a matter of common knowledge. (Compare *Hill v. Lee* (1969), 209 Va. 569, 166 S.E.2d 274.) The witnesses testified as to the nature of the shoulder and Officer Nowicki's testimony, at its strongest, remained only an opinion which the jury was at liberty to accept or reject.

It is a well established rule that this court will not reverse unless the appellant can show that any complained of errors were probably prejudicial to his case. (3 Ill. L. & Prac. *Appeal & Error* § 802 (1953).) To the extent that error did occur, the appellant has not carried his burden here.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.