RAYMOND CRUMP, Plaintiff-Appellant, *v.* UNIVERSAL SAFETY EQUIPMENT CO. *et al.*, Defendants-Appellees.

First District (5th Division)   No. 78-838

Opinion filed November 30, 1979.

John D. Hayes & Associates, Ltd., and Louis Hilfman, both of Chicago, for appellant.

Schaffenegger, Watson and Peterson, Ltd., of Chicago (Donald G. Peterson and Jay S. Nelson, of counsel), for appellee Universal Safety Equipment Co.

Sam L. Millter, Ltd., of Chicago, for appellee Cesco Safety Products, Inc.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Bridgman, and John T. Rank, of counsel), for other appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Plaintiff brought an action to recover damages for personal injuries caused by the alleged unreasonably dangerous products manufactured and distributed by defendants. The jury rendered a verdict in favor of all defendants and plaintiff's post-trial motion was subsequently denied. On appeal plaintiff contends that the trial court committed reversible errors and that the closing argument of defense counsel was improper. We affirm the judgment of the trial court. The pertinent facts follow.

In 1965, plaintiff, Raymond Crump, was employed as a grinder at Continental Can Company in Chicago, Illinois. On December 21, 1965, he was injured while operating a grinding machine manufactured and distributed by defendant Landis Tool Company (Landis). At the time of the occurrence, plaintiff was wearing a pair of safety glasses manufactured by defendant Cesco Safety Products, Inc. (Cesco), and distributed by defendant Universal Safety Equipment Co. (Universal).

Essentially, counts I and II of plaintiff's first amended complaint alleged that the safety glasses manufactured and distributed by Universal and Cesco were unreasonably dangerous in that (a) the side shields were designed, manufactured and assembled such that fatigue cracks developed in the side shields from ordinary use of the glasses; (b) the glasses and side shields were designed, manufactured and assembled in such a manner as to cause the side shields to fracture or crack when the front of the glasses was impacted; (c) the side shields were of insufficient thickness; and (d) the glasses did not protect the cornea from laceration. Count III alleged that the grinding machine designed, manufactured and distributed by Landis was unreasonably dangerous in that it was not equipped with a guard between the operator and the machine to protect the operator from being struck by pieces of metal propelled from the machine.

At trial plaintiff testified that on the day in question he was engaged in adjusting a piece of metal in the grinding machine when suddenly the metal flew out of the machine and struck his face, whereupon he experienced pain in his right eye and on his nose and chin. The safety glasses were knocked off his face as a result of the impact. At this point, one of his co-workers stopped the machine and assisted him. He was then

taken to the company nurse and later to the hospital. As a result of the accident, plaintiff sustained a laceration through the cornea of his right eye, resulting in the removal of that eye.

Plaintiff further testified that shortly after his release from the hospital, he returned to the plant and while there he saw the safety glasses he wore on the day of the accident. He stated that the right lens protruded from the frame and a piece of the side shield was broken. Prior to the accident, however, the glasses appeared to be in good condition, absent any irregularities.

When questioned by the trial judge as to how his eye was injured if the lens of the glasses was not broken, plaintiff replied that he was not sure. Shortly thereafter, a discussion was heard in chambers outside the presence of the jury, during which time counsel for plaintiff moved for a mistrial based on the alleged prejudicial effect such prior questioning by the trial judge might have had on the jury. However, the motion was denied.

Upon resuming the trial, the trial judge directed the following comments to the jury:

"Ladies and Gentlemen, from time-to-time the court may ask a question or two to help the court understand what is happening and what I think will also help you understand the issues, but anything I ask [as] a question, please bear in mind I do not express my opinion as to the facts one way or the other. The facts are for you to decide and you alone and if, occasionally, I do ask a question for clarification from my part, and maybe for you, I do not intend to express my opinion as to the facts, so please keep that in mind.

You are the sole judges of the facts. I do not express my opinion at all. At any time in the past during the trial that I may ask a question it is merely to try to get something clear in my mind that I think might help you understand the issues better."

Frank A. Bittner, a design safety engineer and expert witness for Landis, testified under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60). He stated that the machine in question was manufactured in 1943 and remanufactured to its original standards in 1965. It could accommodate pieces of metal up to approximately 72 inches long and a maximum weight of 1750 pounds. In order to grind a piece, it would have to be placed between two centers and rotated against a grinding wheel. The headstock is usually kept stationary while the tailstock is used to adjust the position of pieces according to their length.

Neither the 1943 nor the 1965 models of the machine were equipped with a guard between the operator and the work piece in order to protect

the operator from pieces propelled from the machine. However, they were equipped with a splash guard which fit between two brackets on the headstock and tailstock sections. Its function is to prevent an operator from being splashed by lubricant from the machine.

Bittner further stated that he had known for the 24 years he has worked for Landis that on occasion pieces have been propelled from the machine. This fact was also known to the industry and Landis. Such propulsion can be caused by a loose headstock or tailstock, the operator's miscalculation, shallow center holes, or breakage of the grinding wheel or work drivers.

According to Bittner, it was the general practice regarding safety at Landis and in the industry for operators to wear safety glasses while using the machines. With respect to the practicality of the safety guard, he stated that to design a guard that would prevent objects propelled from the machine from striking an operator might be prohibitive of good grinding practices.

Serope Kalpakjian, a professor of mechanical engineering at the Illinois Institute of Technology, testified as an expert witness with respect to the grinding machine. In response to a hypothetical question, he stated that the machine in question was unreasonably dangerous in that it allowed matter from the working area to strike the operator and that such an unreasonably dangerous condition might or could have been the proximate cause of injury to the hypothetical person. In his opinion, a guard should have been constructed between the operator and the work area in order to prevent such an occurrence. In support of this position, he illustrated to the jury several guards he had constructed which could be utilized on the machine. He suggested that the most effective type of guard would be one made of a transparent plastic known as Lexan.

Lawrence J. Broutman, a professor of materials engineering at the Illinois Institute of Technology, testified as an expert witness with respect to the safety glasses. He stated that he examined the glasses both visually and microscopically in order to ascertain the nature of the alleged defect. In so doing, he discovered fatigue cracks on the left and right side shields. Fatigue cracks are caused by the application of stress from ordinary usage over a period of time.

Upon an examination of the fracture surface on the right side, he determined that the initial crack was caused by fatigue action. The remaining crack, however, was caused by the application of a sudden force which produced a very rapid fracture. There were also hackle marks on the fracture surface which indicated the occurrence of a traumatic impact.

An examination of the right glass lens revealed several marks on the front surface and two marks on the plastic frame surrounding that lens. In Broutman's opinion, the metal piece or brass bar struck the right glass

lens, but there was no evidence that it directly contacted the side shield. He was also of the opinion that the glasses were unsafe as a result of the sharp corner created during the manufacture of the side shield, and which subsequently caused the fatigue crack; the insufficient thickness of the side shield; and the inadequacy of the material from which the side shield was produced.

In response to a hypothetical question, Broutman stated that the fracture of the side shield could have been the proximate cause of the laceration in that the missing piece of the side shield could have become wedged in between the front of the glass and one's eye socket.

Ronald Van Caporali, a consultant in glass technology and fracture analysis, testified on behalf of defendant Universal. Based upon an examination of the fracture surface on the side shield, he determined that the fracture occurred in at least five separate steps. On direct examination, the following testimony was permitted over the objection of counsel for plaintiff:

> "Defense Counsel: Having made this study of the five fractures, and having examined the eyeglasses, have you formed a conclusion as to the time element involved in those five fractures?
>
> Plaintiff's Counsel: Objection to the question without proper foundation.
>
> The Court: You may resume the seat.
>
> Plaintiff's Counsel: I have an objection to the question without first giving the witness appropriate kinds of credible facts, laying a proper foundation, since there is nothing that has been given to the witness on which he could base an answer to that question.
>
> The Court: Overruled.
> ＊ ＊ ＊
> Defense Counsel: Will you answer, please, Doctor?
>
> Answer: A hesitation point or a dwell mark does not tell you how long a crack hesitates or stops there.
>
> Defense Counsel: So, based merely on the examination of fractures, themselves, you are unable to draw any conclusion as to the time element?
>
> Answer: Right.
>
> Defense Counsel: Okay. Now, having also examined the eye glasses, having done that and examined the side shields, are you able to form a conclusion as to the time element or element involved in the fracture?
>
> Answer: Well, based on my analysis—
>
> Plaintiff's Counsel: I have the same objection, incidentally. This is improper without giving the witness a hypothetical question.
>
> The Court: Well, let's see what he knows, what he is able to

testify from what information he has so far.

Let's—you have the right to cross-examine him. Let's—I will permit him to answer.

Answer: Based on my examination of fracture surfaces and direction of the crack travel it is not possible, in my opinion, for all of these fracture surfaces to form at the same time with one blow."

On cross-examination, Caporali testified that if plaintiff was wearing the glasses at the time of the accident, the brass piece propelled from the grinder would not have contacted his eye. Nor would the portion of the right lens that protruded or the frame of the glasses have lacerated his eye. Furthermore, assuming that a portion of the side shield was missing prior to the accident, the remaining portion would not have caused the laceration.

Edward A. Moffatt, a mechanical engineer and specialist in biomechanics, testified as an expert witness on behalf of defendant Cesco. As a result of conducting various tests, whereby similar safety glasses were impacted, he concluded that the glasses worn by plaintiff were struck very hard by a rapidly moving object and that the intensity of the impact caused the glasses to be pushed backwards. In response to a hypothetical question, he stated that in his opinion the safety glasses were not unreasonably dangerous based on the fact that they were not intended to stop an object the mass and weight and moving at the same speed as the one involved here or to prevent any injuries from occurring.

Frank A. Bittner, called earlier by plaintiff, testified as an expert witness for defendant Landis. During direct examination, the trial court permitted, over plaintiff's objection, the following testimony:

"Defense Counsel: Based upon your experience at Landis and based upon a reasonable degree of scientific and engineering certainty, do you have an opinion as to whether or not the failure to equip the machine with such guard created an unreasonably dangerous condition in that machine?

Plaintiff's Counsel: Objection to the question; without asking a proper hypothetical question.

Defense Counsel: I don't believe I have to ask a hypothetical in view of the charge made here, if your Honor please.

The Court: Well, that's the ultimate issue in the case, isn't it?

Defense Counsel: That's what his hypothetical was as to the guard. It had nothing to do with the operation. The claim is here that, without it, it became unreasonably dangerous and I'm asking if that is his opinion or if he does have such an opinion.

The Court: Objection overruled.

Defense Counsel: Do you have such an opinion, Mr. Bittner?

Answer: Yes, sir.

Defense Counsel: What is that opinion, sir?

Answer: That it was not dangerous."

Bittner further stated that his opinion was based on the fact that a guard of the type referred to here would be very impractical in that it would inhibit the safety of the operator to the extent that he would be unable to see whether or not the work piece was engaged with the work centers or if in the event the work drive became loose, he could not respond quickly enough to stop the machine.

During the instructions conference, the trial court refused plaintiff's Instructions No. 9 (Illinois Pattern Jury Instructions, Civil, No. 12.04 (modified) (2d ed. 1971) (hereinafter IPI) and No. 15 (IPI Civil No. 400.10 (1977 Supp.)), and no objection was made by plaintiff.

During closing argument, counsel for Cesco argued at length regarding the application of certain government standards with respect to the manufacture of the safety glasses. He argued, in effect, that if any evidence existed as to the violation of these standards, plaintiff would have presented it during the trial. There was no objection made by plaintiff at that time.

After the jury had retired, the following colloquy occurred:

" * * *

The Court: I will keep the jury as late as 6:00 o'clock. If they have not agreed by 6:00 this evening, I will declare a deadlocked jury. If there appears to be a deadlock before that time, I will read I.P.I.—5 to them, period.

Defense Counsel: Sure.

Plaintiff's Counsel: Sure.

The Court: I will read that to them.

Defense Counsel: Yes, sir.

The Court: I'll hand it in there to them.

Plaintiff's Counsel: Fine.

Defense Counsel: Fine.

The Court: And do you waive polling of the jury?

Plaintiff's Counsel: No.

Defense Counsel: He said he won't.

Plaintiff's Counsel: No, I will not waive the polling of the jury.

The Court: Pardon?

Plaintiff's Counsel: I will not waive the polling."

Several months subsequent to the denial of plaintiff's post-trial motion, counsel for plaintiff filed an affidavit alleging that the trial judge engaged in a private communication with the jury without a court reporter or the attorneys present and it was at this time that IPI Civil No. 1.05 was read to the jury.

Thereafter, the jury rendered a verdict in favor of all defendants and plaintiff's post-trial motion was subsequently denied. Plaintiff now appeals.

OPINION

Plaintiff initially contends that the trial court committed reversible error by questioning him as to how his eye was struck if the lens of the safety glasses was not broken. He argues that such questioning was improper and prejudicial insofar as the jury could conclude from it that the trial judge viewed his testimony and theory of the case as being without merit. We disagree.

■ As a general rule, wide latitude must be accorded the trial judge in conducting a trial. It is only where his remarks and conduct are of such character that they constitute prejudice in the minds of the jurors that they constitute reversible error. (*Clamage v. Shapiro* (1977), 48 Ill. App. 3d 90, 365 N.E.2d 471.) Here, the trial judge questioned plaintiff as to how his eye was injured if the lens of the glasses was not broken. Following an *in camera* conference, during which plaintiff's motion for a mistrial was denied, the trial judge instructed the jurors regarding their responsibilities as factfinders and advised them that from time to time he would ask a question for the purpose of clarifying a particular point that may be unclear. Upon an examination of the remarks complained of, we cannot say that they caused any prejudice to occur, in light of the prompt action by the trial judge in advising the jury as to the reasoning behind such remarks. *Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 364 N.E.2d 660.

Plaintiff also challenges as error, the trial court's denial of his motion for a mistrial on this issue. Again, we disagree.

The matter of declaring a mistrial rests in the sound discretion of the trial judge and unless there is a clear abuse of that discretion his judgment will not be disturbed on review. (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327; *Sesemann v. Ellington* (1977), 51 Ill. App. 3d 790, 367 N.E.2d 219.) Having determined that the trial court's questioning of plaintiff did not constitute reversible error, we find that the court's discretion in denying plaintiff's motion was properly exercised.

■■ Next, plaintiff contends that the trial court committed reversible error by overruling his objections to the opinion testimony of two expert witnesses. He argues that since the testimony was not based on hypothetical facts given to the witnesses, and it related to contested material issues of fact, the allowance of such testimony is error. In response, defendants argue, and correctly so, that when the opinion of an expert witness is sought regarding his personal knowledge or personal observations, he may express his opinion without a hypothetical presentation.

■■ Expert testimony is permitted when (1) the opinion of the witness is distinctively related to a science, profession, business or occupation and is beyond the knowledge or experience of an average juror; (2) the witness has sufficient skill, knowledge or experience in that field so that his opinion will probably aid the trier of fact in the search for truth; and (3) the state of the art or scientific knowledge permits a reasonable opinion to be asserted by an expert. (McCormick, Evidence §13 (2d ed. 1972); *McClure v. Suter* (1978), 63 Ill. App. 3d 378, 379 N.E.2d 1376.) The fact that an expert witness, in stating his opinion, will testify to an ultimate issue of the case does not render his testimony inadmissible. *Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 340 N.E.2d 550.

■■ In the pending case, Ronald Van Caporali testified as an expert witness on behalf of Universal and Frank A. Bittner testified, likewise, on behalf of Landis. On direct examination, Caporali offered his opinion regarding the time element involved in the formation of the five fracture surfaces on the right side shield of the safety glasses. Similarly, Bittner offered his opinion as to whether or not the failure of Landis to equip the grinding machine with a guard resulted in an unreasonably dangerous condition in the machine.

The qualifications of both Caporali and Bittner, as previously set forth, amply demonstrate that they had extensive experience and knowledge in their respective fields. The record also shows that both witnesses had personal knowledge of the subject matter of their testimony as evidenced by the fact that Caporali examined and analyzed the fracture surface of the side shield and Bittner possessed an extensive knowledge of the nature and function of the grinding machine in question. Under these circumstances, we hold that a hypothetical question was unnecessary and consequently, the trial court did not err in allowing the testimony of both witnesses. *Spence v. Commonwealth Edison Co.*

Plaintiff also contends that the trial court committed reversible error by refusing to give Plaintiff's instructions Nos. 9 and 15. We disagree. Those instructions read as follows:

"No. 9: More than one person may be to blame for causing an injury. If you decide that one or both of the products were unreasonably dangerous and that their condition of being unreasonably dangerous was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may have been to blame.

No. 15: If you decide that the plaintiff has proved all of the propositions of his case, then it is not a defense that the condition of the product or products could not have been

discovered by the defendants or that all possible care was used in the manufacture of the product."

Instructions are proper when they convey to the jurors the correct principles of law applicable to the evidence submitted to them. (*Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262.) And where not supported by the evidence, such instructions should not be given. (*Estate of McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 379 N.E.2d 890.) Here, during the instructions conference all counsel agreed that no attempts would be made to argue that plaintiff's employer, Continental, was in any way at fault in causing plaintiff's injury. The trial judge then stated that if either counsel argued that point, he would give instruction No. 9. Nonetheless, plaintiff now argues that there was ample evidence in the record to support the giving of the instruction by citing several instances where defendants referred to Continental while questioning various witnesses. We do not view, however, such references by defendants as analogous to arguing the issue of Continental's liability.

As to instruction No. 15, plaintiff argues that the theory presented by Landis that it was not feasible to manufacture the machine with a guard between the operator and the work piece was, in effect, a defense that due care was exercised in the manufacture of the machine. We think, however, that plaintiff has misconstrued this point. Rather, the record reflects that the defense presented by Landis was that the grinding machine as manufactured was not in an unreasonably dangerous condition. We find, therefore, that the trial court's refusal to give the instructions was proper as there was no evidence in the record upon which to predicate them.

We next consider plaintiff's contention that the trial court committed reversible error by allowing IPI Civil No. 1.05, which reads as follows:

"Any verdict you may reach must be unanimous. And in your deliberations you should examine the questions submitted with a proper regard and consideration for the opinions of each other. You should listen to each other's arguments with an open mind, and you should make every reasonable effort to reach a verdict."

Plaintiff argues that the instruction was read during a private communication with the jury, without a court reporter present and without any discussion among counsel as to the appropriate procedure to be followed in giving the instruction. We find this contention to be without merit.

Section 67 of the Civil Practice Act requires the trial court to give instructions to the jury only in writing, unless the parties agree otherwise. (Ill. Rev. Stat. 1977, ch. 110, par. 67(1).) The rule was adopted so as to

protect the privacy of the jury deliberations, to enable the parties to be appraised of any communications to the jury, and to allow a record to be preserved. (*Emme v. Pennsylvania R.R. Co.* (1961), 29 Ill. App. 2d 97, 172 N.E.2d 507.) However, the modern rule is that even where communications are not in open court, a verdict will not be set aside unless prejudicial error is shown. *Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 375 N.E.2d 456; *Emme v. Pennsylvania R.R. Co.*

■■ Here, the record shows that after the jury had retired, the judge advised both counsel that if in the event the jury appeared to be deadlocked, he would read IPI Civil No. 1.05 to them. He also stated that he would hand it to them in the jury room. Neither counsel objected to this procedure at that time. Several months subsequent to the disposition of this case, however, plaintiff filed an affidavit alleging that a private communication had occurred between the judge and the jury during which time IPI Civil No. 1.05 was given and that this procedure was improper and prejudicial. He asserts further that since this instruction was given while in the jury room, it follows that the judge had some discussion with the jury concerning their inability to agree or failure to return a verdict. In light of the fact that the record is devoid of evidence showing that a discussion of this type occurred, we can only view such assertions by plaintiff as mere speculation. Even if we were to accept plaintiff's position, he has failed to demonstrate that prejudicial error resulted. We also note that plaintiff did not object to the giving of the instruction during that portion of the proceeding. Consequently, his later objection is untimely. We hold, therefore, that the trial court did not commit reversible error in giving the instruction.

Plaintiff also contends that the closing argument of counsel for defendant Cesco regarding its compliance with certain government standards in the manufacture of the safety glasses was improper, prejudicial and deprived plaintiff of a fair trial. Plaintiff contends further that the basis for his failure to timely object was that such an objection would have created additional prejudice. We reject this contention.

■ In arguing a case to the jury, counsel is permitted broad latitude to draw reasonable inferences and conclusions from the evidence. (*Saputa v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34.) The scope of permissible argument is within the sound discretion of the trial court. (*Saputa.*) Furthermore, an argument must be clearly improper and prejudicial in order for a reviewing court to reverse a verdict on these grounds. *Jones v. Chicago Housing Authority* (1978), 59 Ill. App. 3d 138, 376 N.E.2d 26.

On several occasions during closing argument, counsel for Cesco made reference to the application of certain government standards with

respect to the manufacture of the safety glasses. Defendant contends that this argument was made in order to answer inferences raised by counsel for plaintiff during his cross-examination of expert witness, Edward Moffatt. Upon a review of counsel's remarks in the record, we cannot say that they caused prejudice. Nor do we find a basis in the record to support the conclusion that a timely objection would have caused further prejudice. As such, the trial court did not permit unreasonable latitude in this regard.

Finally, plaintiff contends that the trial court committed reversible error by denying his post-trial motion for a judgment notwithstanding the verdict or in the alternative, a new trial. Again, we disagree.

In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, our supreme court set forth the applicable standard in determining when a trial court should enter a directed verdict or judgment notwithstanding the verdict. The court stated:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

The record shows that through the testimony of expert witnesses both sides presented evidence that if believed by the jury, was sufficient to sustain a verdict in its favor. In applying the *Pedrick* standard to the facts presented here, we hold that the trial court did not err in finding that the evidence, even when viewed in its aspect most favorable to plaintiff does not so overwhelmingly favor plaintiff that no contrary verdict based on that evidence could ever stand.

Furthermore, a motion for a new trial should be granted only if the verdict is contrary to the manifest weight of the evidence. (*Smiley v. Manchester Insurance & Indemnity Co.* (1977), 49 Ill. App. 3d 675, 364 N.E.2d 683.) Allowance or refusal of such a motion lies within the sound discretion of the trial judge, and his judgment will not be reversed except for a clear abuse of discretion which must affirmatively appear in the record. (*Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 378 N.E.2d 757.) Since the trial judge saw and heard the witnesses and considered the evidence and the arguments of counsel before denying the motion, it is clear that he understood his function and the proper criterion to be applied to the motion. Accordingly, we find that the trial court's denial of plaintiff's motion for a new trial cannot be a basis for reversal by this court since the jury's verdict was not contrary to the manifest weight of the evidence.

Having concluded that there were no reversible errors committed by

the trial court and that closing argument of defense counsel was proper, we therefore affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.