BROOKS McCORMICK, JR., Plaintiff-Appellant, v. BROOKS McCORMICK *et al.*, as Trustees, *et al.*, Defendants-Appellees.—CHARLES E. SCHROEDER *et al.*, as Trustees, Petitioners-Appellees, v. BROOKS Mc-CORMICK, JR., Indiv., *et al.*, Respondents-Appellants.

First District (1st Division) No. 1—87—2701

Opinion filed December 5, 1988.—Modified on denial of rehearing March 31, 1989.

D'Ancona & Pflaum and James C. Murray, Jr., and Peter Petrakis, both of Katten, Muchin & Zavis, both of Chicago (Barry T. McNamara and Selwyn Zunn, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Max E. Wildman, Jerald P. Esrich, Craig M. White, and Cal R. Burnton, of counsel), for appellees.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises from: (1) Brooks McCormick, Jr.'s (Brooks Jr.'s), suit for an accounting and damages for breach of fiduciary duty against Brooks McCormick, Sr. (Brooks Sr.), and Charles E. Schroeder (jointly referred to as the Trustees), as former trustees of the Brooks McCormick, Jr., Trust, dated August 5, 1964, as amended (the Trust) and against Miami Corporation and Thomas E. Oehring, as agents of the Trustees (the Agents); (2) the Trustees' petition for approval of their accounts and claim against the Trust for repayment of $32,792.28; (3) the counterclaim of Gary-Wheaton Bank, current trustee of the Trust; (4) Gary-Wheaton Bank's and Brooks Jr.'s counterclaim against the Trustees; and (5) Gary-Wheaton Bank's and Brooks Jr.'s third-party complaint against the Agents for breach of fiduciary duty.

In its November 19, 1985 order, the trial court granted the Trustees/Agents' section 2—619 (Ill. Rev. Stat. 1985, ch. 110, par. 2—619) motion and dismissed the third-party complaint. In its August 24, 1987, order, the court granted: (1) summary judgment in favor of the Agents and against Brooks Jr. on the complaint; (2) partial summary judgment in favor of the Trustees and against Brooks Jr. for all claims based on acts occurring prior to January 1, 1978; (3) final judgment in favor of the Trustees and against Brooks Jr. on the complaint; (4) final judgment in favor of the Trustees and against Brooks Jr. and Gary-Wheaton Bank on the counterclaim to the petition for approval of accounts; (5) judgment in favor of the Trustees and against Brooks Jr. and Gary-Wheaton Bank in the amounts of $32,792.28 plus interest, and $36,000 in trustees fees; and (6) judgment in favor of the Trustees and against Brooks Jr. and Gary-Wheaton Bank in the amount of reasonable attorney fees and costs incurred in making the accounting and in defending against claims asserted in the complaint.

On appeal, Brooks Jr. and Gary-Wheaton Bank contend that: (1) Brooks Jr. is entitled to a new trial on the ground that the trial judge was prejudiced against him; (2) the trial court erred in concluding that the Trustees did not breach their fiduciary duties to Brooks Jr.; (3) the Trustees failed to sustain their burden of proof on the affirmative defenses of consent, acquiescence and ratification; (4) the trial court erred in ruling that Brooks Jr.'s release of a predecessor trustee from

all claims and liabilities also released the Trustees and Agents from all claims and liabilities arising out of their acts for that same period; (5) the trial court abused its discretion in excluding the testimony of Brooks Jr.'s expert witness; (6) the trial court erred in ruling that the Agents could not be held independently liable for breaches of fiduciary duty committed by them in the exercise of authority delegated to them by the Trustees; (7) the trial court erred in awarding trustees fees to the Trustees; (8) the trial court erred in finding sufficient evidence to support the Trustees' claim that they are entitled to recover the sum of $32,792.28 plus interest from the Trust; and (9) the trial court erred in awarding attorney fees and costs to defendants. For the following reasons, we affirm in part, reverse in part and remand with instructions.

This is the second appeal arising from substantially the same facts. The first appeal was decided by this court in *McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 455 N.E.2d 103 (*McCormick I*). For purposes of providing a factual framework for the issues raised in this appeal, the relevant underlying facts set forth in *McCormick I* are reiterated and supplemented as necessary with facts arising subsequent to that decision.

Brooks Jr., as sole beneficiary of the Trust, filed an 11-count verified amended complaint against the Trustees; the Agents; Myron Ratcliffe, past president of Miami Corporation and former cotrustee of the Trust; Otis and Associates, architectural firm retained by Brooks Jr. to prepare plans for Brooks Jr.'s residence and to supervise its construction; and Ragnar Benson, Inc., general contractor hired by Brooks Jr. to build the first phase of the residence. The complaint alleged that in the summer of 1977, construction of Brooks Jr.'s personal residence began on property that the Trust had purchased from Brooks Sr. The complaint further alleged that the Trustees negotiated and accepted an architect's contract and a construction contract which stated that the maximum cost to build the residence would be $398,000. Payments for the residence were to be approved in writing by Brooks Jr. and then paid out of Trust assets by the Trustees.

Counts I through VI of the verified amended complaint alleged that the Trustees and the Agents mismanaged and wasted Trust assets by spending in excess of $1,900,000 on the construction of Brooks Jr.'s residence, the Trustees paid contractors for unfinished work which had not met contract specifications, and made duplicate payments to the architect and contractor. As a result of this alleged mismanagement, Brooks Jr. claimed that a majority of the Trust's assets had been improperly invested in a nonliquid, nonmarketable resi-

dence.

Count VII alleged that Brooks Sr. had built a "spite fence" adjacent to Brooks Jr.'s property and sought an injunction against Brooks Sr. ordering him to remove the fence and to pay compensatory and punitive damages for trespass and other injury to the Trust property. Counts VIII through XI of the complaint alleged breach of contract and professional malpractice against the contractor and architect.

The trial court dismissed counts I through VI with prejudice for failure to state a cause of action. Count VII was severed and dismissed without prejudice on the ground that a cause of action for trespass could be found in its allegations. Counts VIII through XI were also severed and continued in separate litigation. The dismissal of counts I through VI was the basis for the appeal in *McCormick I.*

In *McCormick I,* this court reversed the trial court's decision with respect to counts I and II, affirmed the dismissal of counts III through VI, and remanded for further proceedings. Count I had charged defendants with breach of trust and requested an accounting, a declaration of rights, and compensatory and punitive damages. Count II had alleged waste of trust assets by the Trustees and the Agents.

Upon remand, the Trustees and Agents filed an answer in which they raised, *inter alia,* the affirmative defenses of release, consent, acquiescence and ratification, and filed a counterclaim seeking: (1) attorney fees, costs and expenses incurred in maintaining the petition for approval of their accounts and in defending against Brooks Jr.'s complaint, and (2) compensation for services rendered on behalf of the Trust. The Trustees also filed an amended petition for approval of their accounts, in which they sought repayment of the $32,792.28 sum allegedly owed by the Trust to Miami Corporation, trustees fees, and attorney fees and costs. Brooks Jr. and Gary-Wheaton Bank, as current trustee, filed answers raising the affirmative defense of breach of fiduciary duty. Gary-Wheaton Bank also counterclaimed for instructions from the court as to its obligations concerning acceptance of the accounts of the former Trustees. Additionally, Brooks Jr. and Gary-Wheaton Bank filed a counterclaim against the Trustees and a third-party complaint against Schroeder, Oehring and Miami Corporation, alleging that the Trustees and the Agents had breached their fiduciary duty to Brooks Jr. by making interest-free loans of Trust monies to National Boulevard Bank, of which Miami Corporation is majority shareholder. On November 19, 1985, the trial court dismissed: (1) the third-party complaint with prejudice pursuant to section 2—619 on the ground that the Agents could not be independently liable to Brooks

Jr., and (2) all claims in the counterclaim pertaining to acts by the Trustees prior to January 1, 1978. The basis for the latter ruling was that Brooks Jr.'s release of Myron Ratcliffe, a former trustee, from all claims arising from his acts during his tenure as trustee from 1964 to December 31, 1977, also released the Trustees and Agents from all claims arising from their acts during that period. Subsequently, on April 21, 1986, the trial court applied these rulings to the complaint and granted summary judgment to the Agents and partial summary judgment to the Trustees. On August 24, 1987, following a bench trial, the trial court entered final judgment in favor of defendants.

On appeal, Brooks Jr. first contends that he is entitled to a new trial on the ground that the trial court was prejudiced against him, thereby denying him his right to a fair trial. Specifically, Brooks Jr. argues that the trial judge's comments during trial evidenced an impermissible bias toward lawsuits by one family member against another which predetermined the outcome of the case and deprived him of his constitutional right to due process. In support of his contention, Brooks Jr. enumerates five instances which he claims demonstrate the trial judge's bias: (1) subjective comments made by the judge at the close of the case and prior to entering his order which indicated his dislike for the type of lawsuit at bar and his total disbelief in Brooks Jr.'s testimony; (2) comments by the trial judge at the hearing on the Trustees' motion to dismiss the third-party complaint that he found the vindictiveness between father and son personally repulsive; (3) an evidentiary ruling which precluded Brooks Jr. from introducing expert testimony on the liability issue and certain evidence of damages even though the Trustees had been allowed to introduce similar evidence; (4) an evidentiary ruling which granted the Trustees' motion *in limine* to bar Brooks Jr.'s trust expert from testifying, and the denial of Brooks Jr.'s motion *in limine* requesting that the Trustee's expert be barred from testifying; and (5) evidentiary rulings granting the Trustees' motion *in limine* to bar the evidence and testimony of Brooks Jr.'s damage expert regarding lost appreciation of securities sold by the Trustees and denying Brook Jr.'s motion *in limine* to exclude all evidence of appreciation of Trust assets.

In response to Brooks Jr.'s accusations that the trial court was prejudiced against him, the Trustees/Agents argue that Brooks Jr. has waived this issue for review by failing to raise the question of prejudice in the trial court. If Brooks Jr. believed that the trial court was prejudiced against him, the proper procedure would have been to request a change of venue. Section 2—1001 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1001) governs the proce-

dural requirements for requesting a change of venue and provides, in pertinent part:

"(a) A change of venue in any civil action may be had in the following situations:

\* \* \*

(2) Where any party or his or her attorney fears that he or she will not receive a fair trial in the court in which the action is pending, because \*\*\* the judge is prejudiced against him or her, or his or her attorney \*\*\*. In any such situation the venue shall not be changed except upon application, as provided herein, or by consent of the parties.

\* \* \*

(c) Every application for a change of venue by a party or his or her attorney shall be by petition, setting forth the cause of the application and praying a change of venue, which petition shall be verified by the affidavit of the applicant. A petition for change of venue shall not be granted unless it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, but if any ground for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such ground."

■ Although the right of a party to seek a change of venue on the ground of prejudice is absolute, it may be waived if not asserted at the appropriate time. As a general rule, a petition for change of venue is untimely if presented after the trial court has ruled on a substantial issue in the case. (*People v. Lawrence* (1963), 29 Ill. 2d 426, 194 N.E.2d 337; *Home Federal Savings & Loan Association v. La Salle National Bank* (1970), 130 Ill. App. 2d 285, 264 N.E.2d 704.) The purpose behind requiring a party to file its petition for change of venue before a decision on a substantial issue is made is to prevent counsel from ascertaining whether a court is in agreement with its theory and, if it is not, to assert prejudice and seek a change in venue. (*People v. Lawrence* (1963), 29 Ill. 2d 426, 194 N.E.2d 337.) Although section 2—1001 does allow for the situation where a ground for change of venue occurs after a ruling has been made, the party must file a written application for change of venue or that issue will be waived for review. *Hollo v. Hollo* (1985), 131 Ill. App. 3d 119, 474 N.E.2d 827; *Lannon v. Lamps* (1980), 80 Ill. App. 3d 318, 399 N.E.2d 712; *Home Federal Savings & Loan Association v. La Salle National Bank* (1970), 130 Ill. App. 2d 285, 264 N.E.2d 704.

In the present case, Brooks Jr. acknowledges in his reply brief

that section 2—1001 governs the procedure for requesting a change of venue, but ignores the clear language of section 2—1001 that "venue shall not be changed except upon application, as provided herein, or by consent of the parties." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1001.) Instead, Brooks Jr. relies on *Ludgin v. John Hancock Mutual Life Insurance Co.* (1986), 145 Ill. App. 3d 703, 495 N.E.2d 1237, *Keehner v. A.E. Staley Manufacturing Co.* (1977), 50 Ill. App. 3d 258, 365 N.E.2d 275, and *United States v. Trigg* (7th Cir. 1968), 392 F.2d 860, for the proposition that due process claims of prejudice have been addressed on appeal absent motions for a transfer of venue by the complaining parties. We find these cases to be distinguishable from the present situation and unpersuasive. In *Ludgin,* plaintiff sued defendants under the theories of negligence and *res ipsa loquitor* after she was injured while riding an escalator in the John Hancock building in Chicago. The jury returned a verdict against both defendants. On appeal, defendants alleged that the trial court's opening remarks prior to *voir dire* were highly prejudicial and constituted reversible error. Without any reference to the content of the remarks, the appellate court held that neither the judge's conduct nor his views unduly affected the outcome of the trial. *Ludgin* is clearly distinguishable from the present case on the ground that the defendants in *Ludgin* were not alleging that the court was prejudiced against them, but rather that remarks made by the trial court were prejudicial. The latter situation does not fall within the purview of section 2—1001.

In *Keehner v. A.E. Staley Manufacturing Co.* (1977), 50 Ill. App. 3d 258, 365 N.E.2d 275, plaintiff appealed from an order granting defendant's motion for a change of venue, alleging that the trial court had been prejudiced against him. The appellate court found that the trial court had erred in granting defendant's motion for change of venue after it had ruled on a summary judgment motion, but found that the error was harmless. The *Keehner* court never addressed the issue of compliance with the requirements of section 2—1001 and, thus, is inapplicable to the issue before us.

Lastly, in *United States v. Trigg* (7th Cir. 1968), 392 F.2d 860, defendant was convicted of violating Federal narcotics laws. On appeal, defendant alleged that extrajudicial information received by the trial judge adverse to defendant served to disqualify the trial judge on the ground of prejudice. Specifically, at an interim hearing outside the presence of the jury, the trial judge mentioned that defendant "had been seen at or close to the scene" where a government witness had been found dead. After both sides rested, the trial judge commented that he might know more about the background of the defendant than

the prosecutor did. In holding that the judge's comments were merely expressions of his appraisal of the evidence, the reviewing court never addressed any statutory requirement for change of venue. Accordingly, we find *Hollo, Lamon,* and *Home Federal,* relied upon by the Trustees and Agents, determinative of the issue and conclude that the issue of the trial court's prejudice has been waived for review.

■ Even if the issue of prejudice had not been waived, we do not find that the trial judge's comments deprived Brooks Jr. of his constitutional right to a fair trial. It is well established that a trial judge is presumed to be impartial (*United States v. Baskes* (7th Cir. 1981), 687 F.2d 165) and relies only on proper evidence in reaching a determination on the merits. (*People v. Beasley* (1982), 108 Ill. App. 3d 301, 438 N.E.2d 1305.) The burden of overcoming this presumption rests on the party making the charge of prejudice, who must present evidence of personal bias stemming from an extrajudicial source (*United States v. Baskes* (7th Cir. 1981), 687 F.2d 165; *People v. Beasley* (1982), 108 Ill. App. 3d 301, 438 N.E.2d 1305) and evidence of prejudicial trial conduct (*United States v. Bolden* (7th Cir. 1965), 355 F.2d 453). During a bench trial, a judge's comments are generally regarded as making explicit that which is implicit in the adverse ruling (*People v. Faginkrantz* (1960), 21 Ill. 2d 75, 171 N.E.2d 5), and the judge's subjective opinion as to what the evidence has demonstrated is insufficient to establish personal bias or to raise an inference of prejudice. *United States v. Bolden* (7th Cir. 1965), 355 F.2d 453; *Ludgin v. John Hancock Mutual Life Insurance Co.* (1986), 145 Ill. App. 3d 703, 495 N.E.2d 1237.

■ With respect to the comments made by the trial court as to Brooks Jr.'s credibility and character, the record indicates that these comments were made after the close of all evidence and immediately preceding the court's announcement of its determination. In our view, the court was merely commenting on Brooks Jr.'s credibility as a witness and his underlying vindictive attitude toward Brooks Sr., which is clearly within the purview of the trial court. Regarding Brooks Jr.'s allegations that the trial court's evidentiary rulings demonstrated the court's prejudice, this court has held that allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe the court had personal bias or prejudice for or against a defendant. *People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487.

Next, Brooks Jr. contends that the trial court erred in finding that the Trustees did not breach their fiduciary duty to him by mismanaging and wasting the Trust assets. In support of his position, Brooks Jr. claims that the Trustees had wasted Trust assets by failing

to supervise construction of the residence after the architect was fired in 1977; by failing to ensure that Ragnar-Benson, general contractor, complied with the provisions of its contract; and by making an unjustified payment to Ragnar-Benson. Brooks Jr. further contends that the Trustees breached their fiduciary duty to protect, preserve and prudently invest Trust assets when they made imprudent financing decisions and when they converted two-thirds of the Trust's income-producing assets into a non–income-producing residence which could be sold only for a fraction of its cost.

With respect to the allegation that the Trustees wasted Trust assets, Brooks Jr. claims that when he fired the architect in November 1977, the Trustees had no ability to control or to verify the bills submitted by Ragnar-Benson because it had been the architect's duty to do so. According to Brooks Jr., the original construction contract entered into between Ragnar-Benson and himself, together with subsequent approved written change orders, guaranteed a maximum cost of $449,542 for construction of the residence. On April 17, 1978, Ragnar-Benson submitted requisition No. 6, seeking payment of a sum which was in excess of the agreed maximum. Brooks Jr. objected to the excess payment because Ragnar-Benson could provide no justification for the increased cost. Brooks Jr. alleges that in breach of their fiduciary duty, the Trustees paid a portion of the disputed claim.

The Trustees agree that in April 1978, Ragnar-Benson submitted requisition No. 6, which requested an amount in excess of the maximum contract price, and that Brooks Jr. told Schroeder not to pay. However in a letter dated May 17, 1978, Brooks Jr. authorized the Trustees to pay the balance due on the original construction contract with Ragnar-Benson. The Trustees argue that their payment covered the balance of the original contract price, and not any portion of the disputed amount.

Further, as a result of the disputed billing from Ragnar-Benson, Schroeder instructed Mates, an accountant for Miami Corporation, to review Ragnar-Benson's work records. Mates discovered that Ragnar-Benson did not have the required written change orders. In November 1978, Ragnar-Benson completed its work and submitted another bill which exceeded the contract price by $224,269. At that time, the Trustees consulted with James Trapp, an attorney with McDermott, Will and Emery, who represented both Ragnar-Benson and the Trust. Trapp indicated that failure to pay Ragnar-Benson could result in liens on the property, lawsuits and additional delay in completing the residence.

The Trustees then had an audit done of Ragnar-Benson's records.

The auditor's report was somewhat inconclusive due to Ragnar-Benson's inadequate recordkeeping. In fact, the auditor qualified its findings with the following statement in its report:

"[T]he contractor's cost records are not designed to provide contract costs under the basic contract and for each additional subsequent written and/or verbal change order, and documentation of oral changes that may have been requested by Brooks McCormick, Jr. is lacking. Accordingly, it is not practicable for us to compare costs reported on R.B. requisitions to costs of work quoted in the basic contract or costs actually incurred under either the basic contract or subsequent written and/or verbal change orders."

Subsequently, in an opinion letter dated December 11, 1978, James Trapp advised the Trustees to pay the remaining balance owed Ragnar-Benson for construction of the residence. In rendering the opinion, Trapp noted that the Trustees had "proceeded in a prudent matter [sic] in investigating the billings submitted" and that he could "find no provisions in the trust instrument which would prohibit the Trustees from making the payment, and in fact such payment may be necessary or advisable to protect the value of the investment in this trust asset." As a result, the Trustees made a partial payment of the amount requested by Ragnar-Benson. Before the Trustees made the partial payment to Ragnar-Benson, Schroeder advised Brooks Jr. of the decision. Brooks Jr. was enraged and hired an attorney. The balance has not been paid. In 1981, Brooks Jr. added Ragnar-Benson to his lawsuit against the Trustees.

■ As a general rule, in a situation where the trial judge has heard the testimony in open court and seen and heard the witnesses, a reviewing court will not reverse the findings of fact unless they are contrary to the manifest weight of the evidence. (*Collins v. Nugent* (1982), 110 Ill. App. 3d 1026, 443 N.E.2d 277.) In the case at bar, the construction contract was between Ragnar-Benson and Brooks Jr., as "Owner" of the property. Pursuant to the contract, the owner was to give instructions to Ragnar-Benson through the architect. When Brooks Jr. fired the architect, the intermediary was eliminated and apparently Brooks Jr. gave direct orders to Ragnar-Benson. Although the contract specifically provided that all change orders be written and signed by Brooks Jr., testimony indicated that Ragnar-Benson had acted on verbal orders from Brooks Jr. and had maintained inadequate documentation of these orders. Brooks Jr. suggests that the Trustees' failure to assume the architect's duty and their failure to obtain written change orders was a breach of their fiduciary duty.

However, the fact that the contract was expressly between Brooks Jr. and Ragnar-Benson does not support Brooks' delegation of duties to the Trustees. Further Brooks Jr. fired Otis on his own volition and personally issued verbal change orders to Ragnar-Benson without the Trustees' knowledge.

The record also indicates that the Trustees took every prudent step available to verify costs claimed by Ragnar-Benson. When some costs were unverifiable, they refused to pay the entire amount. Although the Trustees should have retained counsel that did not also represent Ragnar-Benson, counsel did advise them that in rendering his opinion, he had not considered the validity or invalidity of Ragnar-Benson's claims. Rather, counsel was primarily concerned with protecting the Trust assets.

In addition, Brooks Jr. contends that the Trustees dissipated the assets of the Trust to the point that when the Trustees resigned in December 1980, no cash remained in the Trust. In doing so, Brooks Jr. claims that the Trustees had failed in their duty to exercise care and diligence in preserving the Trust principal and in securing for Brooks Jr. a reasonable, regular income. Brooks Jr. also argues that a prudent man would not have converted two-thirds of the Trust assets from marketable, income-producing securities into an overpriced, non–income-producing residence.

■ It is well recognized that trustees must employ such diligence and prudence as persons of discretion and intelligence employ in their own similar affairs. In determining whether a trustee has acted prudently, courts look at the facts as they existed at the time the action was taken, unaided by subsequent events. (*Hatfield v. First National Bank* (1942), 317 Ill. App. 169, 46 N.E.2d 94.) Ordinarily, trustees who act honestly, prudently and in good faith are not liable for errors of judgment. Provided the trustee acts within the powers delegated by the trust, his liability is limited to loss occasioned only through fraud or negligence. *In re Estate of Sanders* (1940), 304 Ill. App. 57, 25 N.E.2d 923.

In response to Brooks Jr.'s. allegations that two-thirds of the trust assets were invested in the residence, the Trustees contend that Brooks Jr.'s figures are erroneous because they fail to consider Trust income, they understate asset values, and they overstate expenses. Specifically, the Trustees indicate that $700,000 of the construction costs constituted a personal loan made by Brooks Jr.; that $120,000 of Brooks Jr.'s personal funds went into the total expense; and that the land, valued at $365,000, had been a gift from Brooks Sr. Brooks Jr. replies that the loan was collateralized by Trust assets and the per-

sonal funds were derived from the Trust. Thus, in essence, the amounts he had expended were Trust assets.

In our view, the evidence indicates that in meeting the expenses of constructing the residence, Brooks Jr. exercised authority granted to him under the Trust and is now attempting to blame the Trustees for not restraining him from his own imprudent behavior. It is important to note that it was Brooks Jr. who decided that the residence should be a Trust asset. Further, the Trust agreement provides that upon reaching the age of 30, Brooks Jr. could withdraw one-third of the Trust principal. At the time Brooks Jr. spent "personal" Trust funds on the residence, he was over 30 years old and had unrestricted access to one-third of the assets. Moreover, the loan collateralized by the Trust funds was expressly authorized in writing by Brooks Jr.

We find those cases relied upon by Brooks Jr. for his contention that the Trustees acted imprudently in not diversifying the Trust assets to be factually distinguishable from the case at bar on the grounds that in those cases, trustees had been obligated to invest funds in income-producing securities in order to provide financial support for the trust beneficiaries. In the present case, paragraph 12(c) of the Trust agreement specifically authorized the Trustees to "retain any part of the trust party *** in non–income-producing or non-earning property." Thus, it would appear that if the Trustees had acted in good faith to invest 95% of the Trust assets in the residence, they would have been acting within the limitations of the Trust agreement. Accordingly, because Illinois law does not impose a duty on a trustee to diversify the trust assets (see *Hamilton v. Nielsen* (7th Cir. 1982), 678 F.2d 709), and the Trust agreement also does not impose such a duty, there is insufficient evidence to indicate that the Trustees acted in an imprudent manner in approving the expenditures for the residence. Further, paragraph 6 of the Trust agreement provides that an investment made by the Trustees in good faith would be proper regardless of any risk, lack of diversification or marketability. We note that Brooks Jr. has not alleged that the Trustee did not act in good faith.

Brooks Jr. further argues that the Trustees breached their fiduciary duties by making unreasonable financial decisions. Specifically, Brooks Jr. argues that the Trustees should have used a less expensive means of financing the residence, such as a mortgage, rather than borrowing money at the variable prime interest rate and pledging valuable trust stocks as security which ultimately necessitated the sale of trust stocks and bonds in order to make the interest payments and to continue the construction.

Relying on *McCormick I,* Brooks Jr. cites to this court's statement that when a trustee is given the power to borrow money and to mortgage or pledge trust assets, he is bound to do so in a reasonable and prudent manner. Brooks Jr. claims that the Trustees' financing decisions demonstrated imprudence, an abuse of discretion, and a breach of their duty to act in Brooks Jr.'s best interest. In support of his position, Brooks Jr. refers to a letter written by Thomas Oehring to Schroeder in which Oehring suggests that as an alternative to either selling securities or borrowing by pledging securities, the Trustees could secure a mortgage against the residence. At that time, it was estimated that an additional $500,000 was needed to complete the residence. With respect to the option of selling securities, Oehring specifically noted that this would result in a "substantial capital gains tax." Oehring appeared to favor using the real estate as security for the loan, although he recognized the disadvantage of locking Brooks Jr. into a "fixed payment schedule for principle and possibly a fixed interest rate." Despite Oehring's advice, the Trustees sold securities rather than secure a mortgage.

At trial, Schroeder testified that the Trustees investigated Oehring's suggestion with respect to a mortgage, but discovered that they could not get one without the residence being completed and a certificate of occupancy issued. When queried as to whether the Trustees had ever attempted to secure construction financing with a mortgage wrap at the end, Schroeder stated that the Trustees believed the $500,000 personal loan to have been a construction loan. With respect to the sale of securities, Schroeder stated that because of Brooks Jr.'s "53 distribution" the sale of securities increased, rather than lessened, the income to the Trust.

Brooks Jr. also criticizes the Trustees for failing to investigate the mortgage financing option with any bank other than National Boulevard Bank. The Trustees reply that no evidence has been introduced to show that better terms could have been secured. Moreover, the Trustees note that the loan secured from National Boulevard in effect benefitted the Trust because the Trust owned stock in National Boulevard. As further evidence of the soundness of its decision, the Trustees note that neither of the successor trustees, Northern Trust or Gary-Wheaton Bank, sought a mortgage. Brooks Jr. claims that the reason no mortgage was sought by either of these banks is that the sale of the residence was imminent.

Brooks Jr. also relies on the testimony of Joseph Trindl, his expert witness, as to damages he incurred as the result of the Trustees' excessive expenditures. Trindl testified that Brooks Jr. was damaged

in the amount of $1,380,000 as the result of the sale of numerous trust securities and bonds to finance the sale of the residence and short-term borrowing instead of securing a mortgage. Trindl further stated that the total spent on construction of the residence was $1,655,000. In Trindl's opinion, a mortgage should have been obtained at the point at which $900,000 had been spent, which was the amount the residence should have cost. However, when queried on cross-examination, Trindl admitted that the house was a little over 50% complete at the point $900,000 had been spent. Further, Trindl could not name a specific institution that would make a mortgage on a house without an occupancy permit.

▆▆ Based upon the evidence introduced by the parties and this court's standard of review, we do not find the trial court's decision to have been contrary to the manifest weight of the evidence. In our view, the evidence indicates that the Trustees investigated a variety of financing possibilities and acted in a prudent manner in arriving at their good-faith decisions. Accordingly, we conclude that the trial court properly determined that the Trustees did not breach their fiduciary duty to Brooks Jr.

Next, Brooks Jr. argues that the issue of whether he had consented to the Trustees' action is not properly before this court. However, if this court finds that it is, Brooks Jr. claims that he had never consented to the Trustees' expenditures on the residence and, therefore, is not estopped from arguing that the Trustees had breached their fiduciary duties. Preliminarily, it is unclear to this court as to why Brooks Jr. has raised the issue of consent if he does not feel the issue is properly before this court. As appellant, he simply should not have raised it. This is particularly true in light of the fact that Brooks Jr. admits that the trial court did not find that he had consented to the Trustees' actions. We further note that because the trial court found that the Trustees had not breached their fiduciary duties, the question of Brooks Jr.'s consent is moot. For the foregoing reasons, we fail to find the relevance for raising the issue of consent unless Brooks Jr. was anticipating that, on appeal, the Trustees would argue in the alternative that Brooks Jr. had consented to their actions and was estopped from arguing breach.

Assuming *arguendo* that the question of Brooks Jr.'s consent is properly before this court, Brooks Jr. argues that the Trustees did not support their burden of proving consent because the actions upon which the Trustees rely "do not amount to the 'informed consent' necessary to absolve them from liability for their breaches of trust." In reliance upon *Merchants National Bank v. Frazier* (1946), 329 Ill.

App. 191, 67 N.E.2d 611, Brooks Jr. contends that in order to establish informed consent, it must appear that the beneficiary knew all the facts, was apprised of his legal rights and was under no disability to assert those rights. Further, it must be shown that the beneficiary acted freely, deliberately and advisedly with the intention of confirming a transaction he knew or should have known was a breach of the Trust. Specifically, Brooks Jr. states that the Trustees had the burden of proving that he knew: (1) the nature and value of his Trust assets at the beginning of the project; (2) the assessment of the amount the Trust could reasonably expect to spend on the residence; and (3) the effects continued expenditures would have on the Trust assets. Brooks Jr. further claims that he was never informed as to the assets comprising his Trust in either 1964 or 1971; he was never informed that the Trust could support, at the maximum, a $500,000 residence; he was never informed as to cost analyses; he was never informed as to which securities had been sold; and was never shown annual financial reports.

In addition, Brooks Jr. argues that even if he had consented to the expenditures, the Trustees had a duty to protect him from himself under the provisions of "this protective Trust." Brooks Jr. predicates this argument on the Trust provision which allows Brooks Jr. to revoke or amend the Trust before his fortieth birthday only by the written consent of the Trustees. Brooks Jr. construes this to mean that the "true meaning and intent" of the Trust is that the Trustees deemed Brooks Jr. "incapable of prudently conserving, managing, and investing his assets." We note that Brooks Jr. offers no legal support for this argument.

■ As a general rule, a beneficiary of a trust who consents to or approves of an act, omission or transaction by a trustee, may, upon the ground of waiver or estoppel, be precluded from subsequently objecting to the impropriety of such act, omission or transaction. The rule may arise from acquiescence, request, participation or notification. (*Chicago Title & Trust Co. v. Shellaberger* (1948), 399 Ill. 320, 77 N.E.2d 675; *Grundy County National Bank v. Cavanaugh* (1982), 105 Ill. App. 3d 718, 434 N.E.2d 803.) In the present case, the record is replete with evidence indicating Brooks Jr.'s knowledge of the Trustees' actions and his overt acts to assume a controlling role in approving billing submitted by the contractors and subcontractors and to direct the Trustees to make payments.

First, Schroeder testified that it was standard procedure for Miami Corporation, the family holding company, to retain all trust documents. Family members, including Brooks Jr., who desired to view

the trust documents could do so at anytime. Thus, if Brooks Jr. had never reviewed the Trust, it was by his own volition. Second, Brooks Jr. stated in his deposition on March 14, 1985, that Miami Corporation discussed the projected income and projected assets of the Trust with him in 1976. At trial, a portion of Brooks Jr.'s diary, from June 1, 1976, to August 31, 1977, was put into evidence, part of which indicated that on September 14, 1976, Brooks Jr. met with Myron Ratcliffe, former trustee, to discuss the loan. On March 10, 1977, Brooks Jr. met with Schroeder and Hoppe to discuss the selection of contractors and contracts. They also discussed estimated cash flows for the next two years, whether to put the property into trust, and whether to "borrow *** and/or sell *** stock *** to pay for the house." Third, the record also indicates that Brooks Jr. signed a personal note for $500,000, secured by stock, and also signed the contracts with his architect and with Ragnar-Benson. Fourth, the record indicates that Brooks Jr. was forwarded a certified audit report and statement of assets on hand with respect to the Trust on May 1, 1978, when Ratcliffe resigned as trustee of the Trust. The record also contains a copy of a letter, dated May 17, 1978, from Brooks Jr. to the Trustees, requesting that they sell securities from the Trust in the amount of $400,000 for costs in building the residence. Further, there are numerous letters from Brooks Jr. to the Trustees instructing them as to what bills to pay and when. In one handwritten letter to Schroeder, dated October 6, 1978, Brooks Jr. requested information on all contracts so that he could assume the role of general contractor.

■ Based upon the extensive documentation to which Brooks Jr. had access and the evidence as to his knowledge of the Trust expenditures on the residence, we find that the trial court's ruling could have been supported by the defenses of consent, acquiescence and ratification, even though the trial court did not expressly rely on these defenses for its determination.

Next, Brooks Jr. contends that the trial court erred in releasing the Trustees and Agents from all trust-related claims arising prior to January 1, 1978. Based upon the "Ratification and Release" (the Release) executed by Brooks Jr. on May 17, 1978, with respect to Myron Ratcliffe, a former trustee, the trial court granted partial summary judgment in favor of the Trustees and Agents, releasing them from any liability resulting from their acts or omissions prior to January 1, 1978. Brooks Jr. had been advised by Schroeder that Ratcliffe had retired from Miami Corporation and resigned as trustee of the Trust, effective December 31, 1977. In order to avoid a costly judicial proceeding to settle the Trust account, Schroeder, as successor Trustee to

Ratcliffe, advised Brooks Jr. to execute the Release, which states in pertinent part:

"WHEREAS, I have made such examination as I deem necessary of the accounts of the trustees, including the most recent certified audit report for the years ended December 31, 1977 and December 31, 1976 and the Statement of Assets on Hand at December 31, 1977 ***, and find such accounts to be proper and correct;

\* \* \*

*** I do hereby:

1. Acknowledge that the Statement of Assets on Hand at December 31, 1977, *** correctly sets forth all of the assets which comprise the trust property of the aforesaid trust as of such date, and

2. Ratify, confirm and approve each and every act of Myron F. Ratcliffe as trustee of the aforesaid trust, and release and discharge him, individually and as trustee aforesaid, his heirs, personal representatives, successors and assigns, from any and all claims and liabilities of any kind whatsoever arising out of or occurring in connection with his acts as such trustee from the inception of the trust to the effective date of his resignation, December 31, 1977."

Brooks Jr. contends that the unambiguous language of the Release acts to release only Ratcliffe from liability for his actions prior to his resignation on December 31, 1977. It did not operate to release Schroeder, Brooks Sr. or the Agents. In response, the Trustees and Agents argue that: (1) the application of the Release is irrelevant on appeal because Brooks Jr. has failed to cite any instances of alleged misconduct prior to January 1, 1978; and (2) the release of one trustee is a release of the remaining trustees and their agents.

Initially, we find that Brooks Jr.'s argument that the language of the Release is unambiguous contradicts his position that Schroeder is a proper party defendant in this action. Schroeder is the successor trustee to Ratcliffe, and the Release on its face releases all successors of Ratcliffe from liability. Accordingly, by the plain language of the Release, Schroeder was properly dismissed and is not a proper party defendant.

■■ Moreover, relevant common law doctrine regarding the liability of cotrustees also supports the trial court's decision. It is well recognized that the liability of cotrustees is joint and several, and the same legal principles which govern the liability of joint tortfeasors apply to cotrustees. (See *Pappas v. Moss* (D.N.J. 1969), 303 F. Supp.

1257; G. Bogert, Trusts & Trustees §862, at 35 (2d ed. 1982).) Prior to the enactment of "An Act in relation to contribution among joint tortfeasors" (the Act)[1] (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*), effective September 14, 1979, Illinois common law provided that the release of one joint tortfeasor was the release of all, even though the other tortfeasors were not specifically named in the Release. This theory applied to those currently liable for a single indivisible injury as well as to those that were technically joint tortfeasors. *Schrempf v. New England Mutual Life Insurance Co.* (1982), 103 Ill. App. 3d 408, 412, 431 N.E.2d 402.

In *Bryan v. Creaves* (7th Cir. 1943), 138 F.2d 377, a case similar to the one at bar, plaintiff executed a release as to certain of several joint tortfeasors/trustees. Based upon the language of the release and upon Illinois law, the trial court granted summary judgment as to the remaining trustees on the ground that because all of the trustees were jointly liable, the Release discharged the claim against all. Recognizing its obligation to apply Illinois law, the Federal appeals court affirmed, stating:

> "Inasmuch as the instruments effectuated satisfaction of a demand for relief against joint tort-feasors and the release of some of those joint tort-feasors and did not amount to merely a covenant not to sue, they must be held to operate as a release of all." 138 F.2d at 379.

 ██ Brooks Jr. further contends that the court is obligated to uphold the intent of the parties at the time the Release was executed, which intent was that the Release was effective only as to Ratcliffe. Although the intention of the parties controls the scope and extent of the Release (*Schrempf v. New England Mutual Life Insurance Co.* (1982), 103 Ill. App. 3d 408, 431 N.E.2d 402), the intent examined is whether it is intended as absolute and unconditional, not whether it is intended to release all joint tortfeasors. (*Porter v. Ford Motor Co.* (1983), 96 Ill. 2d 190, 449 N.E.2d 827.) Accordingly, Brooks Jr.'s argument as to his intent to limit the release to Ratcliffe is irrelevant. Finally, as to the liability of Miami Corporation and Oehring, as agents of the Trustees, they cannot assume liability for acts from which the principal has been released. For the reasons discussed, we conclude that the trial court did not err in releasing the Trustees and Agents from all claims arising prior to January 1, 1978.

---

[1]The Act does not apply to the present case because the execution of the Release preceded the effective date of the Act. See *Porter v. Ford Motor Co.* (1983), 96 Ill. 2d 190, 449 N.E.2d 827.

Next, Brooks Jr. contends that the trial court abused its discretion by granting the Trustees/Agents' motion *in limine* to exclude the expert testimony of Addis Hull, an attorney specializing in estate planning, trust and probate law. It is well established that the decision as to whether to admit evidence is within the discretion of the trial court, which decision will not be reversed absent clear abuse of discretion. (*Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 444 N.E.2d 220.) While it is true that an expert may directly express his opinion on an ultimate issue (*Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 461 N.E.2d 57; *Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188), expert opinions are generally not admissible on matters of which the trier of fact is knowledgeable unless the subject is difficult of comprehension and explanation (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 382 N.E.2d 1201) and the witness' testimony will aid the trier of fact in the search for truth (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188).

In his brief, Brooks Jr. suggests that Hull was providing information to the trial court which was beyond the court's knowledge. For example, Brooks Jr. states that Hull proposed to testify as to the "applicable standard of care" of a trustee. In actuality, as evidenced by Hull's opinion, which is included in the record, Hull merely applied the facts to the law, *i.e.*, the Illinois Trust and Trustees Act (Ill. Rev. Stat. 1985, ch. 17, par. 1651 *et seq.*), and rendered a legal opinion that Brooks Sr. and Schroeder were "imprudent in the performance of their duties as co-trustees." In essence, Hull offered no more than another legal opinion to support Brooks Jr.'s position. In our view, he did not testify as to any matters not within the trial court's knowledge or beyond the comprehension of the court. Since his testimony would not "aid the trier of fact in the search for truth" (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188), the trial court did not abuse its discretion in excluding Hull's testimony.

Next, Brooks Jr. contends that the trial court erred in dismissing his third-party complaint and in granting summary judgment to the Agents. In raising this issue, Brooks Jr. has merged two orders entered by the trial court. First, in an order entered November 19, 1985, the trial court granted the section 2—619 motion filed by Brooks Sr. and Schroeder to dismiss Brooks Jr.'s counterclaim and also granted the section 2—619 motion filed by Miami Corporation, Schroeder and Oehring to dismiss Brooks Jr.'s third-party complaint.

The counterclaim/third-party complaint was filed by Brooks Jr. and Gary-Wheaton Bank on August 6, 1985, and alleged breach of fiduciary duty; negligent failure to exercise sound investment judgment; and wilful, wanton and malicious violation of duties. The second order, dated August 25, 1987, granted, *inter alia*, summary judgment in favor of Oehring and Miami Corporation on counts I and II of Brooks Jr.'s verified amended complaint for accounting and other relief and partial summary judgment in favor of Schroeder and Brooks Sr. on all claims and causes of action based upon or arising from alleged acts or omissions occurring prior to January 1, 1978.

As argued by the Trustees and Agents, the November 19, 1985, order which dismissed the counterclaim/third-party complaint was not raised in Brooks Jr.'s notice of appeal and, thus, is not properly before this court. (*Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.* (1979), 78 Ill. 2d 56, 398 N.E.2d 3; *Harvey v. Carponelli* (1983), 117 Ill. App. 3d 448, 453 N.E.2d 820.) Accordingly, we limit our review of this issue to the August 26, 1987, order.

Brooks Jr. contends that in granting summary judgment to Oehring and Miami Corporation, as agents of the Trustees, the trial court improperly applied the rule that agents cannot be held independently liable for tortious acts committed within the scope of their authority. It is undisputed that Oehring and Miami Corporation at all times acted within the scope of their authority as agents of the Trustees. However, Brooks Jr. argues that Oehring's and Miami's "active participation" in the Trustees' breach of fiduciary duty provides grounds for holding them liable. In support of his argument, Brooks Jr. relies on *Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 394 N.E.2d 1273. In *Grover*, plaintiff, Abner Grover, owner of a condominium unit at Commonwealth Plaza, brought a contract action against Commonwealth Plaza Condominium Association (the Association), and its management agent, Sudler & Company (Sudler). Plaintiff sought to recover money he allegedly spent as a result of defendants' breach of an alleged agreement to install heating units in the individual condominium units in a specific systematic order. The Association's authority is vested in a board of directors, which retained Sudler to act as managing agent of the property.

Between October 1976 and September 1977, the board became aware of heating and air-conditioning problems in the units and directed Sudler to arrange the manufacture and installation of new heating units for those condominium owners who wanted to purchase them. On October 7, 1977, Sudler sent a letter to the condominium

owners, informing them that it had received a firm proposal on the heating units from Thermo-Dynamics and those that wanted one were to fill out a form as soon as possible. All orders would be processed in the sequence in which they were received.

Plaintiff placed his order for three units the next morning. Thermo-Dynamics commenced installation in January 1978. In a letter dated January 11, 1978, Sudler advised the owners that the first heaters were being installed in those condominium units in which the heaters had become inoperative. Installation would then proceed in a systematic manner.

Plaintiff contacted Sudler seven times complaining about the installation delay. Plaintiff and the other residents then received another letter from Sudler stating that the heaters were being installed on a priority basis only upon payment of an additional $30 charge. Plaintiff's heaters were installed in February 1978 on a priority basis after payment of the $30 charge. In his complaint, plaintiff sought $30 for the extra charge, plus $75 for electric blankets and an electric heater, and approximately $200 for additional electricity used by the blankets and heater. The jury returned a verdict in favor of plaintiff and against the Association and Sudler in the amount of $30.

On appeal, Sudler argued, *inter alia,* that because it had acted only as an agent of the Association, it could not have been liable. The reviewing court recognized that, as a general rule, an agent whose agency has been disclosed is not liable on a contract entered between a third person and a principal. However, if the agent exceeds his authority or takes an active part in violating a duty owed by the principal to a third party, the agent may be liable. The court reasoned that the jury could have found that Sudler had exceeded its actual authority when it wrote the October 7 letter which bound the Association to a certain sequence of installation or that Sudler took an active part in violating the Association's duty to plaintiff.

■■ Brooks Jr. interprets *Grover* to indicate that if an agent is actively taking part in the principal's activities, it can be liable. This interpretation would completely undermine the general rule of no liability. Presumably, if an agent is doing his job of effectuating the directions of his principal, he will be taking an "active part" in the principal's activity. In our view, *Grover* demands a more narrow reading of the "active part" exception, *i.e.,* the agent is liable if he takes an active part in violating a duty owed to a third person by the principal without the principal's knowledge. Moreover, in light of our affirmance of the trial court's determination that the Trustees had not breached their fiduciary duty, Brooks Jr.'s claim that Oehring's and

Miami's active involvement in the trust management rendered them liable for the Trustees' breach of fiduciary duty is moot.

Next, Brooks Jr., contends that the trial court erred in awarding compensation for services rendered to the Trust by the Trustees. Based upon the theory of *quantum meruit*, the trial court entered judgment in the amount of $12,000 per year for trustee services rendered for 1978, 1979 and 1980 in favor of Brooks Sr. and Schroeder. On appeal, Brooks Jr. contends that the Trustees failed to establish their right to trustees' fees.

With respect to Brooks Sr., Brooks Jr. argues that the plain language of paragraph 12(p) of the Trust prohibits payment to Brooks Sr. for his services as Trustee. Paragraph 12(p) provides:

"12. In the administration of the trusts, the trustees, except as otherwise provided in this instrument, shall have the following powers and rights and all others granted by law:

\* \* \*

(p) To pay all taxes and all reasonable expenses, including compensation to any independent trustee and the agents and counsel \* \* \* of the trustees."

Contrary to the Trustees' statement in their brief that the Trust does not define "independent trustee," paragraph 19 of the Trust defines "independent trustee" as "the trustee or trustees from time to time qualified and acting other than [Brooks Jr.'s] wife or a descendant of [Brooks Jr.'s] father." At trial, Schroeder defined "independent trustee" as "a non-family trustee." It is Brooks Jr.'s position that because the Trust authorizes payment of compensation only to independent Trustees, the Trust impliedly denies payment to family Trustees such as Brooks Sr. As further support for his position that compensation should not be awarded to Brooks Sr., Brooks Jr. argues that when services are rendered by a family member, the presumption of law is that the services were intended to be gratuitous. The burden is on the family member to overcome this presumption by either an express contract or by facts and circumstances which show that both parties contemplated that compensation be paid at the time the services were rendered. (*Rush v. Estate of Rush* (1960), 27 Ill. App. 2d 242, 169 N.E.2d 538.) In the present case, there is no evidence of an express contract. Moreover, there is no evidence that any payment had ever been made to Brooks Sr. for his services as Trustee since the Trust's inception in 1964.

Regarding Schroeder, Brooks Jr. admits that Schroeder is an independent trustee, but claims that Schroeder has expressly waived the right to receive compensation. It is well recognized that the right of a

trustee to claim compensation for his services is personal to him and can be waived by him. *Gorin v. McFarland* (1967), 80 Ill. App. 2d 398, 224 N.E.2d 615.

In a letter to Brooks Jr., dated September 10, 1979, Schroeder outlined the different capacities in which he operated and their concomitant duties so as "to clarify" these points for Brooks Jr. Specifically, under the heading "THE DIFFERENT CAPACITIES IN WHICH WE WORK AT MIAMI CORPORATION," and the subheading "Trustee," Schroeder stated:

> "As trustees your father and I have an independent status to manage trust assets and exercise other powers for your benefit as we deem advisable. However, our role in that capacity again is separate and does not extend to personal work for you on your individual affairs. The latter can come only from a Power of Attorney from you directly to me.
>
> Again I should state that, in contrast to corporate trustees such as bank trust departments, I take no fee and make no charge for my services as a trustee."

The Trustees attempt to minimize the importance of the preceding by characterizing it as "a simple statement of fact" by which Schroeder indicated that he took no fee "at that time"; it did not state that "he would never take a fee." We find this characterization unpersuasive. The September 10, 1979, letter was on its face a detailed outline of all functions performed by Schroeder as president of Miami Corporation, as attorney in fact for certain principals, and as Trustee. It was a "simple statement of fact" only in the fact that it clearly expressed Schroeder's understanding and agreement that he would not receive compensation for his duties as Trustee. When one undertakes to serve gratuitously, he cannot recover anything upon an implied contract. *Gorin v. McFarland* (1967), 80 Ill. App. 2d 398, 224 N.E.2d 615.

Further, we find the theory of *quantum meruit* inapplicable to Schroeder's duties as Trustee because he was fairly compensated for his investment and management duties as president of Miami Corporation. Thus, we find that there is no inequity in denying Schroeder separate compensation as Trustee. For the reasons mentioned, we conclude that the trial court erred in awarding Trustees' fees to Brooks Sr. and Schroeder.

Next, Brooks Jr. contends that the trial court erred in entering judgment of $32,792.28 plus interest in favor of Brooks Sr. and Schroeder. At trial, Schroeder testified that not all of the McCormick family trusts had separate bank accounts. Instead, money was kept in

just a few accounts and records were kept by Miami Corporation as to deposits and credits for each trust. Miami would then issue payments for the expenses of each trust pursuant to the direction of the respective Trustees. In December 1980, a clerical error was made in Miami's recordkeeping which resulted in Miami's making a payment on behalf of the Trust in the amount of $32,792.28. Consequently, when an accounting was made of the income and principal accounts of the Trust as of December 31, 1980, the Trust showed a deficit of $32,792.28.

Because the Trust account was transferred to Northern Trust, effective January 1, 1981, and Schroeder was no longer Trustee when the clerical error was discovered, Schroeder did not have access to the Trust account to repay Miami for its cash advance. Instead, Schroeder had to seek repayment from Northern Trust, as successor Trustee. Northern Trust recognized the debt to Miami on its year-end Trust financial statement for 1980, but refused to pay the debt because of Brooks Jr.'s instructions not to do so.

As a result, Miami set up an escrow account in which it deposited Trust dividend checks it received. When Northern learned about the escrow account, it filed suit against Miami for the funds. The suit eventually settled and Miami forwarded to Northern Trust the amount due the Trust plus accrued interest. However, Miami retained the right to sue for repayment of the $32,792.28 plus interest.

Subsequently, Miami filed a counterclaim seeking payment of $32,792.28 plus interest. In its order dated August 25, 1987, the trial court found that Miami's claim for repayment was sustained by the evidence and entered judgment in the amount of $52,808.96 against Brooks Jr. and Gary-Wheaton Bank, as successor Trustee. This amount represented $32,792.28 in repayment; $5,260.13 for interest previously paid by Miami to Northern Trust, as successor Trustee; and $14,756.55 for interest due through August 1, 1987, at a rate of 9% *per annum*.

On appeal, Brooks Jr. argues that "the so-called 'loan' was not a loan at all, but an *ultra vires* act" which rendered repayment unnecessary. Apparently, as an alternative argument, he further argues that Miami "failed to establish the existence of a 'loan' because they never established an *express* contract to borrow money." In our view, Brooks Jr.'s use of the word "loan" is an ineffective attempt to characterize certain transactions in such a way as to bring them within the scope of otherwise inapplicable legal principles. The evidence indicates that the amount of $32,792.28 was a cash advance with no initial charge of interest from Miami to the Trust pursuant to longstanding Trust management policy. As stated previously, Miami did

not maintain separate bank accounts for each of the over 100 McCormick family Trusts it managed. Rather, funds were kept in a few accounts and sums were transferred as necessary and balances were maintained for each trust in Miami's records. Because the facts do not support Brooks Jr.'s characterization of the $32,792.28 as a loan, we find that his legal arguments regarding the technical requirements of a loan to be irrelevant.

■■■ Brooks Jr. presents an equally unpersuasive argument with his contention that because Miami, as the Trustees' agent, lacked the Trustees' permission to overspend the Trust account and, in fact, violated the Trustees' specific instructions not to overspend, Miami breached its duty to the Trustees and had no right to repayment. This argument fails for two reasons. First, Brooks Jr. predicates this argument on an "undisputed" statement that Schroeder specifically instructed Oehring not to spend more money than existed in the Trust. At trial, when asked if he had so instructed Oehring, Schroeder replied, "Not that I remember." Second, as mentioned in Brooks Jr.'s brief and testified to by Schroeder, the $32,792.28 did not represent an expense in excess of the Trust funds; it was merely a clerical error on Miami's books. Once Miami recognized this error, it sought repayment from the Trust.

In addition, Brooks Jr. claims that he has no legal obligation to repay the amounts paid by Miami to Ragnar-Benson in 1980 because those payments had been made voluntarily by Miami. In direct contradiction to this claim, Schroeder testified that in March 1980, Brooks Jr. authorized the Trustees to do whatever was necessary to complete the residence and to market it. We do not find the court's resolution of the contradictory claims is against the manifest weight of the evidence.

■■■ With respect to the interest portion of the August 25, 1987, judgment, the parties had stipulated to the fact that $5,260.13 in interest had been paid by Miami to Northern. Regarding the assessment of $14,756.55 in interest at the rate of 9% *per annum*, section 2 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" (Ill. Rev. Stat. 1987, ch. 17, par. 6402) provides that "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due *** on money *** advanced for the use of another." Where the rate of interest awarded could only have been arrived at by pure speculation, the court must apply the statutory rate of 5%. (*First Arlington National Bank v. Stathis* (1983), 115 Ill. App. 3d 403, 450 N.E.2d 833.) In the present case, there is no indication as

to how the court arrived at the rate of 9%. Accordingly, we find that the amount of interest due for the period up to August 1, 1987, should be recalculated at the rate of 5%.

Next, Brooks Jr. contends that the trial court erred in assessing attorney fees and costs against him personally on the grounds that his claims against the Trustees were groundless and vexatious. In its August 25, 1987, order, the trial court held:

"(H) Judgment is entered in favor of Charles E. Schroeder and Brooks McCormick [Sr.] and against Brooks McCormick Jr. and Gary-Wheaton Bank, as successor trustee, in the amount of reasonable attorneys' fees and costs incurred in making the accounting. Judgment is also entered in favor of all defendants in Case No. 81 CH 0147 and against Brooks McCormick Jr. in the amount of reasonable attorneys' fees and costs incurred in defending against claims asserted in the Verified Amended Complaint for Accounting and Other Relief."[2]

As a general rule, Illinois courts look with disfavor upon assessing fees against a losing party (*Peoples Gas Light & Coke Co. v. Black Steer Provision Co.* (1985), 131 Ill. App. 3d 387, 475 N.E.2d 1012) and will not do so unless the fees are specifically authorized by statute or provided for by contract between the parties. (*Board of Education of School District No. 170 v. Illinois State Board of Education* (1984), 122 Ill. App. 3d 471, 461 N.E.2d 567.) In the present case, there is neither an applicable statute nor a contract authorizing the recovery of attorney fees against Brooks Jr. personally. Moreover, we find that the trial court's characterization of Brooks Jr.'s claims as "groundless and vexatious" is contradicted by this court's determination in *McCormick I* that counts I and II of Brooks Jr.'s complaint alleging breach of trust, refusal to account and waste of trust assets were sufficient to state a cause of action and to withstand a motion to dismiss. For these reasons, we conclude that the trial court erred in assessing attorney fees against Brooks Jr. personally.

With respect to that portion of the trial court's order which assessed fees against Gary-Wheaton Bank, as successor trustee, the failure of either Brooks Jr. or Gary-Wheaton to clearly define an issue regarding that assessment or to present a cohesive legal argument on that issue before this court has waived review of the fee and cost award assessed against Gary-Wheaton Bank, as successor trustee.

---

[2]In the initial stages of the trial proceeding, the trial court consolidated the complaint for breach of fiduciary duty filed by Brooks Jr. (No. 81—CH—0147) and the petition for approval of trustees' accounts filed by the Trustees (No. 81—CH—0117).

(See *Thrall Car Manufacturing Co. v. Lindquist* (1986), 145 Ill. App. 3d 712, 495 N.E.2d 1132.) Accordingly, our determination regarding the propriety of the trial court's order assessing fees and costs is limited to those assessed against Brooks Jr. personally.

For the aforementioned reasons, the judgment of the circuit court is affirmed as to the following: (1) the determination that the Trustees did not breach their fiduciary duty to Brooks Jr.; (2) release of the Trustees and Agents from all claims arising before January 1, 1978; (3) exclusion of Addis Hull's testimony; (4) dismissal of the third-party complaint and grant of summary judgment in favor of the Agents; and (5) judgment in favor of Brooks Sr. and Schroeder for $32,792.28 plus $5,260.13 for interest previously paid by Miami to Northern Trust, as successor Trustee. The judgment of the circuit court is reversed as to: (1) the award of compensation to Brooks Sr. and Schroeder as cotrustees; (2) the award of attorney fees and costs assessed against Brooks Jr. personally; and (3) the assessment of interest on Miami's cash advance to the Trust at a rate of 9% *per annum*, and remanded solely for a recalculation of the assessment of interest at the statutory rate of 5% *per annum*.

Affirmed in part; reversed in part and remanded with instructions.

QUINLAN and MANNING, JJ., concur.